[Crim. No. 16831. In Bank. Dec. 20, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
FRANK CULVER, Defendant and Appellant.

## Counsel

Curtis Hillyer, under appointment by the Supreme Court, and Marshall H. Lichtenstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Gloria DeHart and Timothy A. Reardon, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**TOBRINER, J.**—In 1963 defendant, Frank Culver, was convicted of attempted murder.[1] Defendant filed a timely notice of appeal, but thereafter failed to file an opening brief and the appeal was subsequently dismissed. On February 26, 1971, the dismissal was set aside,[2] the remittitur recalled and the appeal reinstated. This case is thus before us on direct appeal from defendant's 1963 conviction.

The defendant presents two contentions on appeal: (1) that confessions made by him to the police were involuntary under the rationale of *Townsend* v. *Sain* (1963) 372 U.S. 293 [9 L.Ed.2d 770, 83 S.Ct. 745] and (2) that the evidence presented at trial was insufficient as a matter of law to show that his wife was alive when he attempted to kill her.

### 1. The facts.

At 9:45 a.m. on February 28, 1962, a police officer arrived at Frank Culver's residence in Oakland. He observed a garden hose attached to an

[1] Culver was charged twice with murder and brought before a magistrate, and the magistrate twice refused to find probable cause. A new charge of attempted murder was brought and after a third preliminary examination, he was held to answer.

[2] On December 11, 1970, the United States District Court for the Northern District of California (Weigel, Judge) ordered Culver's appeal reinstated on the ground that his counsel was ineffective under the standards of *Gairson* v. *Cupp* (9th Cir. 1969) 415 F.2d 352.

outside gas line; the hose extended into defendant's bedroom window. He and another officer succeeded in pulling the hose out of the window. The officer then knocked at the front door of the residence; a male voice responded, "Wait a minute, while I get some clothes on." Culver, dressed in pajamas which were covered with blood in the chest area, opened the door. Laura Culver, defendant's wife, was found in the bedroom, the room into which the hose had been placed. She was lying on the bed; her body was still warm. Emergency efforts to revive her failed.

Frank Culver was placed under arrest and then taken to the county hospital to be treated for stomach wounds that he had inflicted upon himself just prior to the entry of the police officers. He was admitted to the hospital at 10:10 a.m. Commencing at 10:30 a.m., he gave a statement to police investigators. He followed with a second statement at 2:40 p.m. the same day. Later that afternoon, Culver underwent surgery for his abdominal wounds.

In his first statement, defendant admitted attaching the hose to the gas meter and placing it through the window at approximately 12 o'clock the previous night; further, he stated that although he believed his wife to be despondent and desirous of death, he had not discussed his idea of joint suicide with her. During his second statement, the defendant indicated the location in the house where he placed the wrench used to connect the hosing to the gas line and stated that "I just killed my wife" and was "Guilty as they come." Additionally he reiterated that his intent had been to take both his own and his wife's lives.

An autopsy performed on defendant's wife determined the cause of death to be "respiratory failure and hypoxia, probably due to acute alcoholism." At trial, however, the coroner testified that his findings were consistent with death from inhalation of natural gas. Blood atmosphere tests performed on the victim disclosed the presence of natural gas in her bloodstream.

2. *The record does not establish that defendant's confessions were obtained while defendant was under the influence of drugs.*

The defendant contends that the two confessions elicited from him by the police on February 28, 1963, were involuntary as they were the products of scopolamine and Demerol administered to him by hospital personnel. ■ Clearly a confession that is adduced from an individual whose "will was overborne" (*Reck* v. *Pate* (1961) 367 U.S. 433, 440 [6 L.Ed.2d 948, 953, 81 S.Ct. 953]) or is not "the product of a rational intellect and a free will" (*Blackburn* v. *Alabama* (1960) 361 U.S. 199, 208 [4 L.Ed.2d 242, 249, 80 S.Ct. 274]) should not be admitted into

evidence because it is involuntary; the United States Supreme Court has indicated that confessions elicited by the use of hyoscine[3] and phenobarbital are not the products of a rational intellect or free will. (*Townsend* v. *Sain* (1963) 372 U.S. 293 [9 L.Ed.2d 770, 83 S.Ct. 745]; see *In re Cameron* (1968) 68 Cal.2d 487, 498 [67 Cal.Rptr. 529, 439 P.2d 633].)[4]

Thus we must examine the record before us to determine if, in fact, Culver's confessions were the involuntary[5] product of drug ingestion, however beneficially administered. ■ Although the hospital's medical records were entered into evidence at trial and although Culver's counsel objected to the admission of defendant's confessions, counsel did not argue the question of the effect of the scopolamine and Demerol injections. No medical experts were called to testify. This does not, however, bar us from an independent examination of the medical records and a reevaluation of the question of voluntariness. (*People* v. *Berve* (1958) 51 Cal.2d 286, 290-291 [332 P.2d 97]; *People* v. *Trout* (1960) 54 Cal.2d 576, 583 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418].)

An examination of the hospital records does not establish the accuracy of Culver's contention that his confessions were obtained while he was under the effects of the drugs in question. Although these records demonstrate that both scopolamine and Demerol were administered to defendant on the day in question, they are ambiguous as to the hour of their administration.[6]

---

[3]Hyoscine and scopolamine are equivalent drugs. (Blakiston's New Gould Medical Dict. (1951) p. 481; see *Townsend* v. *Sain* (1963) 372 U.S. 293, 298 [9 L.Ed.2d 770, 777, 83 S.Ct. 745].)

[4]In *Townsend* the court found that the combined dosage by injection of ⅛-grain phenobarbital and 1/230-grain of hyoscine given to petitioner to alleviate drug related withdrawal symptoms rendered Townsend's statements constitutionally inadmissible. The court expressly refused to make a finding as to the effect of the specific dosage administered to Townsend (372 U.S. at p. 309, fn. 5 [9 L.Ed.2d at p. 783].) It should be noted additionally that in *Townsend,* unlike the instant case, the respondent specifically admitted that Townsend's confession occurred immediately after the injection of drugs. Further, in *Townsend* considerable expert testimony was elicited on both sides concerning the probable effect of the drugs which were administered.

[5]Because of the reinstatement of defendant's original appeal in 1970 this case did not technically reach a final judgment prior to the decisions of *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758] and *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], but under *People* v. *Rivers* (1967) 66 Cal.2d 1000, 1005 [59 Cal.Rptr. 851, 429 P.2d 171] it is clear that defendant may not claim the protection of those authorities. (See, e.g., *People* v. *West* (1967) 253 Cal.App.2d 348, 356-357 [61 Cal.Rptr. 216].) Instead, the governing standard is simply whether the prosecution sustained its burden of establishing that the statements were voluntary. (*People* v. *Berve* (1958) 51 Cal.2d 286, 291 [332 P.2d 97].)

[6]The records specifically state that 75 milligrams of Demerol and 1/150 grain of

A well settled principle of appellate review dictates that all intendments be indulged to support the trial court findings and that the reviewing court consider the evidence in a light most favorable to the respondent. (*People* v. *Sweeney* (1960) 55 Cal.2d 27, 33 [9 Cal.Rptr. 793, 357 P.2d 1049].) ■ When, as here, the record is ambiguous as to the hour when the medications were administered, we must uphold the trial court's determination of the voluntariness.[7] The trial court, after initially admitting the confessions, properly instructed the jury that under California law in effect at that time, the jury was the final arbiter of the issue of voluntariness.[8]

scopolamine were administered on February 28 at an "hour not shown." In fact, any inference to be drawn from the handwritten notations indicates that the medication was probably administered *after* the confessions but prior to the late-afternoon surgery. The relevant records indicate two sets of doctors' directives, each in a different handwriting and signed by a different doctor. The nurse's notations opposite the first set indicate that such directions were carried out between 10:10 a.m. and 3:10 p.m. The order to administer the drugs in question, however, appears in the second set of directions, thereby suggesting that such order was carried out after the confessions were elicited.

[7]The dissent raises the suggestion that the scopolamine was administered to defendant on behalf of the police for the purpose of inducing defendant's confessions. This is the first time such a suggestion has been made in the entire lengthy history of these proceedings; significantly, defendant has never argued, and does not now contend, that the drug was prescribed or administered for such a purpose.

The dissent apparently bases its conjecture in this regard on an assumption that the only medical reason for prescribing scopolamine to a patient is to take advantage of its "truth serum" qualities. Yet medical authority does not support this bare assertion; a leading medical dictionary states that the drug scopolamine "is used mainly as a sedative in psychiatry and *surgery*." (Italics added.) (Blakiston's New Gould Medical Dict. (1951) p. 915.) The medical authorities relied upon in the dissent do not dispute this usage. Thus, a reasonable inference from the present record, in support of the judgment, is that the drug was administered to defendant as a sedative shortly before his late afternoon surgery and several hours after both of his confessions. There is no support in the record for the dissent's assertion that "scopolamine and Demerol had been promptly ordered by the doctor" (*infra,* p. 551) upon defendant's admission to the hospital.

The dissent also implies that even if scopolamine had not been administered to defendant prior to his confessions, defendant's physical condition may in itself have been so serious as to render the confessions involuntary. Defendant, however, presented absolutely no evidence, medical or otherwise, as to his physical condition at the time of the interrogations; the only relevant evidence in the record is the testimony of the interrogating police officer, who stated that defendant was coherent, appeared to understand all questions, and gave responsive answers throughout the questioning period. The officer also testified that several medical personnel, including a doctor, were present throughout the entire interrogation; defendant has not presented affidavits from any of these individuals contradicting the police officer's testimony. The trial judge who heard the testimony determined that defendant's confessions were voluntary, and on the present record we cannot properly overturn that decision.

[8]Submission of the voluntariness issue to the jury, after an initial determination of this issue by the trial court, constituted the proper procedure at the time of trial. (See *People* v. *Gonzales* (1944) 24 Cal.2d 870, 876-877 [151 P.2d 251]; *People* v. *Lindsey* (1972) 27 Cal.App.3d 622, 630-631 [103 Cal.Rptr. 755].) With the adoption of the Evidence Code, effective January 1, 1967, California now gives the trial judge the

In light of the record before us we must conclude that defendant has not established as a matter of law that his confessions were involuntary.

3. *Substantial evidence supports the determination that Mrs. Culver was alive when defendant placed the hose in the bedroom window.*

Defendant argues that his actions were not the cause of his wife's death; that her death resulted from "acute alcoholism." In reality, defendant questions whether the prosecution produced sufficient evidence to demonstrate that his wife was alive at the time he placed the hose in the bedroom window.

In reviewing the evidence on appeal, the applicable test is not whether guilt has been proven beyond a reasonable doubt, but rather whether substantial evidence supports the conclusion of the trier of fact. (*People* v. *Daugherty* (1953) 40 Cal.2d 876, 885 [256 P.2d 911]; *People* v. *Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].) The reviewing court does not perform the function of reweighing the evidence; instead, the court must draw all inferences in support of the verdict that can reasonably be deduced from the evidence. (*People* v. *Newland* (1940) 15 Cal.2d 678, 681 [104 P.2d 778].)

Applying these principles, we find sufficient evidence to support the trier of fact's implied finding that the victim was alive when defendant positioned the hose. The time of death was established as between 4 a.m. and 6 a.m. on the morning of February 28, 1962. Earlier, at approximately midnight, defendant attached the hose to the gas line, placed it through the window of the bedroom, and turned the nozzle to permit the flow of gas. Blood atmosphere tests performed on Mrs. Culver's body disclosed the presence of natural gas in her blood, and testimony indicated that this gas could be absorbed only if she were alive. The coroner testified that his findings concerning the cause of death, i.e., "respiratory failure and hypoxia, probably due to acute alcoholism," would be consistent with death from inhalation of natural gas.

Accordingly, the evidence is sufficient to support the verdict.

The judgment is affirmed.

Wright, C. J., McComb, J., Burke, J., Sullivan, J., and Clark, J., concurred.

final responsibility for determining the admissibility of confessions, and the court is required to determine the admissibility of a confession outside the presence of the jury if the party so requests. (Evid. Code, §§ 400, 402, subd. (b), 405; *People* v. *Lindsey* (1972) 27 Cal.App.3d 622, 631 [103 Cal.Rptr. 755].)

**MOSK, J.—**I dissent.

A confession is voluntary when it is the product of a rational intellect and a free will. (*Blackburn* v. *Alabama* (1960) 361 U.S. 199, 208 [4 L.Ed.2d 242, 249, 80 S.Ct. 274].) If the will of the accused is overborne by the interrogation and if he would have remained silent but for the improper influence, the resultant confession must be deemed involuntary. (*Bram* v. *United States* (1897) 168 U.S. 532, 562 [42 L.Ed. 568, 580, 18 S.Ct. 183].) An involuntary confession tends to be unreliable. (*Jackson* v. *Denno* (1964) 378 U.S. 368, 383 [12 L.Ed.2d 908, 919, 84 S.Ct. 1774, 1 A.L.R.3d 1205].) "These standards are applicable whether a confession is the product of physical intimidation or psychological pressure, and, of course, are equally applicable to a drug-induced statement. It is difficult to imagine a situation in which a confession would be less the product of a free intellect, less voluntary, than when brought about by a drug having the effect of a 'truth serum.' " (*Townsend* v. *Sain* (1963) 372 U.S. 293, 307-308 [9 L.Ed.2d 770, 782-783, 83 S.Ct. 745].)

In its only judicial definition the drug scopolamine is described as a truth serum which causes amnesia and hallucination, gives its subject a "heightened motivation to cooperate" (*United States* ex rel. *Townsend* v. *Twomey* (7th Cir. 1971) 452 F.2d 350, 368) and results in disorientation from his environment. (*Id.* at p. 367.) In the *Townsend* case, scopolamine (also known as hyoscine) was administered together with phenobarbital, a tranquilizer; in the instant case it was added to Demerol, an analgesic.

The majority, in footnote 7, cite as authority a 1951 medical dictionary declaring scopolamine to possess sedative qualities. I hope no inference arises therefrom that although statements obtained through use of truth serum are inadmissible, interrogation by police of a suspect under sedation is to be condoned.

While it may be true that generally the colloquial "truth serum" is sodium pentathol, scopolamine appears to have some of the same effects, in that the drug obtunds consciousness, producing a "twilight sleep," and the patient has none of his conscious defenses. Unlike sodium pentathol, however, under scopolamine the tendency is to babble confusedly, in a delirium; where normally the subject might not answer, under this drug he will answer but not necessarily truthfully.

Modern medical texts describe the effects of scopolamine in these terms:

Goodman and Gilman, Pharmacological Basis of Therapeutics (3d ed. 1970), page 535: "The behavior and mental symptoms [after injection of the drug] suggest an acute organic psychosis. Memory is disturbed, orientation is faulty, hallucinations (especially visual) are common . . . and

mania and delirium are not unusual. The diagnosis of an acute schizophrenia episode or alcoholic delirium has been mistakenly made."

Falconer, Patterson and Gustafson, Current Drug Handbook (1972) page 60: "[Scopolamine] exerts a depressant action on the brain, heart and respiration; side effects include impaired vision, delirium, convulsions, with occasional severe depression."

Beeson and McDermott, Textbook of Medicine (13th ed. 1971) page 146: "The mental symptoms [of ingestion of scopolamine] include drowsiness, confusion, disorientation, and vivid optical hallucinations . . . ."

II Gleason, Gosselin, Hodge and Smith, Clinical Toxicology of Commercial Products, page 34: ". . . Many of the untoward signs and symptoms [of scopolamine usage] can be related to paralysis of the glands and smooth muscles . . . the most dangerous and spectacular manifestations arise from intense excitation of the central nervous system. The symptomatology includes restlessness, fatigue, excitement and confusion, progressing to mania and delirium."

Dorland's Medical Dictionary (24th ed.) page 1355: "Scopolamine is an alkaloid of the atropo-belladonna family and is used as a central nervous system depressant, chiefly found in the form of scopolamine hydrobromide. It has a sedative effect on the brain and produces retrograde amnesia, blocking out memories of pain."

Burger, Medicinal Chemistry (3d ed.) page 1549: "The poisonous nature of solanaceous alkaloids [which include scopolamine] have been known for many centuries. The toxic properties of the deadly nightshade are evident when . . . the black berries . . . of hedgerow . . . are eaten. The [victims] become delirious." And on page 1544: "Anti-cholinergic drugs [of which scopolamine is one] interfere with physiologic functions that are dependent on cholinergic nerve transmission."[1]

What can be gleaned from these and all reliable references is that statements made under the effect of scopolamine, administered for any purpose, are inherently unreliable and not in any sense voluntary. The drug is not, as erroneously described by the majority, a mere sedative. If the subject to whom the drug is administered becomes confused, amnesiac and hallucinating, it would appear that anything related during such period cannot be held competent and admissible.

---

[1] Also see The Merck Index (Stecher ed. 1968) page 936; Schmidt, Attorney's Dictionary of Medicine, page 274-275; Stedman's Medical Dictionary (22d ed.) page 1129.

The majority concede that scopolamine was administered to defendant on the day he confessed, but they declare the hospital records "are ambiguous as to the hour" of administration. It is true that the records are not as explicit as might be desired. Nevertheless it taxes credulity to find that no relationship exists between injection of a drug with truth serum qualities and police questioning on the same day, and it is equally incomprehensible to speculate, as do the majority in footnote 6, that the truth drug may have been given *after* the confession. One is compelled to ask: since Demerol had been given to ease his pain, what possible purpose could there be in administering a type of truth serum to this defendant if not to facilitate his response to interrogation?

Conceding that the hospital records do not relate the precise hour drugs were given to defendant on the day he confessed, I find a chain of persuasive circumstantial evidence from which one must conclude his response to police interrogation was not free and voluntary.

We are compelled to resort to circumstantial evidence because of gaps in the record. The lacunae are attributable not to defendant but to the inadequacy of his previous counsel—the same counsel who failed to file a brief on appeal and who was found by Judge Weigel of the United States District Court to be ineffective under the standards of *Gairson* v. *Cupp* (9th Cir. 1969) 415 F.2d 352. We should not, therefore, deny this defendant our studied consideration of his appeal on the merits merely because he had the misfortune to be represented ineffectively. Indeed, the federal court's factual determination of inadequacy of representation suggests we must delve into the appeal with a more thorough independent analysis, rather than to rely, as do the majority, on the trial court's blanket finding of voluntariness of the two confessions.

Defendant was admitted to the hospital at 10:10 a.m. on February 28 with serious wounds. The preoperative diagnosis was that of a stab wound in the abdomen with two diaphragmatic rents, one centimeter and two centimeters in extent. A police officer, with stenographer, questioned him at 10:30 a.m. for 15 or 20 minutes. The officer admitted that defendant grimaced in obvious pain. It is not unreasonable to infer that defendant also suffered shock as a result of his traumatic experience. The hospital records reflect that defendant was in need of medication, for scopolamine and Demerol had been promptly ordered by the doctor. If we cannot assume the nursing staff complied immediately with the medical directive, certainly there must have been compliance within four hours. To suggest otherwise, as do the majority, is a startling and unsupported indictment of the hopsital for unconscionable inefficiency in the care and treatment of a seriously wounded patient.

Four hours later, at precisely 2:40 p.m., the second interrogation took place. The police officer testified that at that time defendant did not appear to be in pain. Since corrective surgery had not yet been performed and nothing further had been ordered or done to assuage defendant's discomfort, it is logical to attribute the lack of evident pain and the abject cooperation with the interrogator to the injection of the drugs previously ordered—Demerol, the analgesic, and scopolamine, the type of truth serum.

Thus, even if it were proper initially to question a seriously wounded suspect in obvious pain, probably in shock, and in need of medication, shortly before surgery—which I am not prepared to concede—certainly there is no conceivable rationale by which the statements induced in the second interrogation, after injection of drugs, should have been received in evidence.

I would hold that an insurmountable burden rests on the prosecution when it' seeks to introduce into evidence a confession obtained from a suspect who has been administered a type of truth serum drug or who has been sedated with any drugs having a tendency to affect his normal mental processes. Chief Justice Traynor, for the majority of this court in *In re Cameron* (1968) 68 Cal.2d 487, 502 [67 Cal.Rptr. 529, 439 P.2d 633], found a tranquilizing drug to have destroyed the defendant's will to resist, to have rendered him unable to comprehend the seriousness of his predicament or the significance of acceding to the prosecution's reconstruction of the crime. So here I would find the second confession, given while defendant was under the influence of scopolamine, to be clearly involuntary. I also have serious doubts as to the admissibility of the first confession, given either after the drug was administered or, if before, at a time when the suspect was seriously wounded, in intense pain and probably in shock, and determined by physicians to be in need of medication.

I would reverse the judgment.