[Crim. No. 27581. Second Dist., Div. One. Apr. 19, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
JASON ARTHUR STROHL, Defendant and Appellant.

**COUNSEL**

Earl M. Price and Cheryl Krott for Defendant and Appellant.

Stanley M. Roden, District Attorney, and Patrick J. McKinley, Deputy District Attorney, for Plaintiff and Respondent.

**OPINION**

**HANSON, J.—**

### INTRODUCTION

Defendant Jason Arthur Strohl (hereinafter defendant or STROHL), following a jury trial, appeals from judgment of conviction on four

counts of giving and offering to give a bribe to the Chief Deputy Coroner of Santa Barbara County, Lawrence R. Gillespie (hereinafter GILLESPIE), with the intent of influencing his acts, decisions and opinion involving the disposition of the remains of indigent deceased, in violation of Penal Code section 67.

The prosecution claimed that defendant STROHL, who operated the Neptune Society in the Santa Barbara County area, wanted to obtain an exclusive contract with the County of Santa Barbara for disposing of the unclaimed bodies of indigent deceased by cremation and dissemination at sea at the rate of $250 per case.[1] In furtherance of that objective defendant STROHL paid GILLESPIE certain moneys and was to continue to pay him for his assistance in his capacity as the county's Chief Deputy Coroner "X" dollars per unit (body); that on one occasion STROHL paid GILLESPIE $35 for funneling a body of an indigent deceased to the Neptune Society contrary to the established procedures for handling such matters.

Defendant denied an intent to bribe GILLESPIE and asserted the defense of entrapment.

## THE FACTS

Defendant STROHL went to Santa Barbara County in August 1974 for the purpose of establishing the office of the Neptune Society, a legitimately licensed organization, created primarily as "an alternative to the high cost of dying" by providing low cost burial service for its members. He owned a 90 percent interest in Neptune Society's operation in Santa Barbara, Ventura and San Luis Obispo counties under a limited partnership agreement with the parent company which retained a 10 percent interest. The Neptune Society owned a 100-foot yacht named *K'Thanga* and chartered a 50-foot yacht named *Cheyenne* for purposes of dissemination of human ashes at sea.

At the time STROHL opened operations in Santa Barbara County, GILLESPIE was employed by the county in the dual capacity as a deputy sheriff and chief deputy coroner. GILLESPIE's work as chief deputy coroner was physically conducted from the sheriff's office and his badge and identification papers identified him as "Deputy Coroner-Deputy Sheriff." In his capacity as chief deputy coroner, GILLESPIE's duties

---

[1] It was estimated that 200 to 300 indigents die annually in Santa Barbara County.

were those enumerated in the Government Code which included the responsibilities of investigating all deaths relating to trauma or non-natural causes and all deaths in which the decedent had not seen a physician in the previous 20 days, signing all death certificates, reviewing all cases within the coroner's jurisdiction, disposing of all property and the remains of any decedent, and notifying next of kin, if any. He had the further responsibility of advising county officials regarding contracts for services with private coroners.

Upon his arrival in Santa Barbara, STROHL contacted GILLESPIE to explain to him how the bodies of card-carrying members of Neptune Society were handled, and sought information regarding whom to contact to discuss a possible contract between Neptune Society and Santa Barbara County in relation to the handling of indigent and welfare cases in need of burial services.

In September 1974 GILLESPIE received an invitation from STROHL to attend a boat cruise on October 1, 1974, courtesy of the Neptune Society, which he refused.

In early October 1974 defendant STROHL was contacted by a Mrs. Evelyn Dudley, who stated she had heard of Neptune Society's services, and expressed interest in becoming a member. During the course of their conversation, Mrs. Dudley told STROHL she had terminal cancer and was contemplating suicide and would like to avoid an autopsy and embalming, if possible. STROHL thereafter attempted to contact GILLESPIE to clarify legal procedures in regard to autopsy and embalming.

On October 15, 1974, Mrs. Dudley committed suicide and a coroner's investigation into her death was conducted. STROHL was interviewed by GILLESPIE on October 21, 1974, in connection with Mrs. Dudley's death because there was some suspicion as to STROHL's role in her death since he had been named by her as a responsible person for her estate, and there was evidence that he had prior knowledge of her imminent demise and had attempted to bypass normal autopsy procedures in disposing of her body.

Although the coroner's office and Deputy GILLESPIE's investigation resulted in no criminal findings, and the investigation on the Dudley case was closed on October 24, 1974, the investigative unit of the sheriff's office continued its investigation into STROHL's activities, having information that STROHL and/or Neptune Society was attempting to influence

officials in counties other than Santa Barbara. Since STROHL had previously requested that GILLESPIE provide him with the name or names of persons whom he should contact regarding a possible contract with Santa Barbara County, GILLESPIE put him in touch with an undercover agent, Deputy Robert Norton, who used the name "Bob Justin" and posed as a representative of another mortuary establishment.

On November 2, 1974, Deputy Robert Norton, using the name "Bob Justin," attended a Neptune Society boat cruise similar to the one which GILLESPIE had been invited to attend on October 1 but had refused. Deputy Norton testified at the trial that his purposes for being there were in connection with the Dudley matter and possible involvement of coroner officials of counties other than Santa Barbara. When Deputy Norton arrived at the yacht *K'Thanga* he was introduced to STROHL and, among others, a person involved in the coroner's office of Ventura County. After a drink or two, STROHL took Norton ("Bob Justin") from the yacht *K'Thanga* to the yacht *Cheyenne* which was docked next to it. Deputy Norton testified at the trial that while they were alone in the salon of the *Cheyenne,* STROHL stated that "he was going to meet with Larry on a Monday, and he wanted to be friends with Larry, and he was going to offer maybe Larry $500 or a color TV" and that "if he did not have Larry as a partoner [*sic*] that without him he couldn't succeed if he had to go through with a bid, something on a bid, that he needed Larry and Larry's help and expertise." Deputy Norton further testified he advised STROHL that the best way to approach GILLESPIE would be to do it legally, but STROHL said that "he would rather pay Larry than somebody else to keep it in the family."

On November 4, 1974, at approximately 11 a.m., Deputy Norton had a telephone conversation with STROHL which was tape recorded. Norton testified that the gist of the conversation was that he (STROHL) was going to meet GILLESPIE that afternoon and that STROHL said "that he felt without Larry's assistance, again, he would be out in left field. He had to have Larry to work with him. He stated that. I then stated to him that the approach to do it legally would be the best approach and he stated that he would rather pay Larry than somebody else to keep it in the family."

Later, during the evening of the same day, November 4, 1974, Deputy Norton had another short telephone conversation with STROHL and testified that the gist of the conversation was that STROHL said "he [STROHL] had approached Larry, made Larry a proposition and Larry

told him that he would have to think about it. Larry went home and in turn called Mr. Strohl back at a later time and Mr. Strohl told me that he was under the opinion that Larry would go the whole bit, the whole route, he would go all the way. Those would be quotes, and that was the gist of the conversation."

On November 4, 1974, between the two telephone conversations of the same day between Norton and STROHL, referred to above, STROHL met with GILLESPIE in the interview room at GILLESPIE'S office, and their conversation was tape recorded. The transcribed tape recording contained the following statements made by STROHL to GILLESPIE: ". . . you want X number of dollars per unit, you get X number of dollars per unit.[2] You want this, you want some type thing, you name it." When GILLESPIE indicated his concern about putting his "neck in a noose," STROHL reassured him by saying: "I told you once, I ain't gonna burn you, I wouldn't put your neck in a loop . . . discretely [sic]. When any person puts this type of package together, . . . it isn't done overnight—I wanted it done completely." GILLESPIE indicated to STROHL that he needed time to think it over.

On the same day, November 4, 1974, at approximately 7 p.m., STROHL and GILLESPIE had a telephone conversation which was also tape recorded. During this conversation STROHL told GILLESPIE the "deal" was still available, and the two started to negotiate the amount of the payoff per case (body) from STROHL to GILLESPIE.[3]

---

[2] At trial defendant testified the "unit" referred to was a dead body.

[3] Following is a portion of the tape recorded conversation: .

"GILLESPIE: I figure if I am going to do it, I might as well do it. Is that deal still available?

"STROHL: Sure. What are you scared about?

"GILLESPIE: I don't know. I am kind of paralyzed sitting there in my own office talking about it, so I went home and had dinner, went back to the office, that's where I am calling you from now.

"STROHL: Oh, all right. Hey, we will make any kind of deal as far as that's concerned, and I said to you earlier, I will go try to prove to you I don't burn you.

"GILLESPIE: I don't know how you can put it to me.

"STROHL: You name it, and I will try. I say I will try, I will do it.

"GILLESPIE: Did you mention $60 per case?

"STROHL: Per case.

"GILLESPIE: Yeah.

"STROHL: Whatever you would like. When I say whatever you would like, . . . .

" . . . . . . . . . . . . . . . . .

"STROHL: All right. So then, would you want fifty a case?

"GILLESPIE: How about seventy-five?

"STROHL: I think we can work it out. . . .

On November 12, 1974, at approximately 12:30 p.m., STROHL met GILLESPIE at Tucker's Grove Park in Santa Barbara. Defendant STROHL got into GILLESPIE's car, and their conversation was recorded by use of a tape recorder concealed in the vehicle. GILLESPIE testified that during this meeting STROHL suggested that he (GILLESPIE) sign a note for $1,000 (purportedly to pay GILLESPIE's wife's medical expenses) so if their "deal" was ever disclosed they would have "something to cover both of us." When GILLESPIE told STROHL that "no note should be involved" as he "didn't want it hanging over my head" and advised STROHL he couldn't pay it back, STROHL said "the note is no problem, it is just between you and I. . . . I will forget it, I will tear up the damn note."

On November 13, 1974, at approximately 7:15 p.m., GILLESPIE telephoned STROHL (which conversation was also tape recorded), who again expressed fears that GILLESPIE would give the county cases to someone else and told him, "I don't give a shit what I got to pay you so far as this is concerned." STROHL also stated that to facilitate payments, "I must have a post office box, I got to have one anyhow, I think the less my face is seen out there, the better off it would be," and later said, "I better pay you in cash for your own good."

On November 20, 1974, STROHL and GILLESPIE met again at Tucker's Grove Park. Their conversation was recorded by tape recorder concealed in the vicinity of the park bench. While sitting side by side on the park bench, STROHL handed GILLESPIE a folded $100 bill (count I) "under the table" which was in front of the bench.

During this meeting the two again negotiated how much STROHL would pay GILLESPIE per unit.[4] STROHL indicated he was in the process

---

"
"STROHL: Then we talk $50 type thing instead of so much of this other.
"GILLESPIE: Okay.
"STROHL: That type of thing. You want some next week?
"GILLESPIE: That sounds good. When can you get back up here?
"STROHL: I plan to come up Tuesday. . . .
"
"STROHL: You name it. I lay it in your hands, in your office as far as an envelope is concerned.
"GILLESPIE: I don't know about that.
"STROHL: It wouldn't be too good."

[4]Following is a portion of GILLESPIE'S testimony at trial:
"Q [By MR. SNEDDON]: Now, in that connection, did you have a specific conversation with Mr. Strohl with regard to how much you would get paid per each unit

of getting a post office box key for GILLESPIE and future payment would be made via the post office box.

During the evening of November 20, 1974, following the face-to-face meeting of that date at Tucker's Grove Park, GILLESPIE called STROHL on the telephone and said he was shocked that he got only $100 as he expected $1,000. The transcription of this tape-recorded conversation reflects that STROHL replied: "That's what there is now. What I told you I had to give it to you in smaller doses, so hold fast and I will get you some next week and keep it going whether the case is coming in or not."

On December 2, 1974, STROHL and GILLESPIE met again at a park bench in Tucker's Grove Park where STROHL handed GILLESPIE another $100 bill (count II) and a key to a post office box. STROHL told GILLESPIE that all future payments should be picked up at the post office box and more money would be forthcoming.

On December 18, 1974, GILLESPIE went to Post Office Box No. 784, opened it with the key supplied by STROHL and retrieved an envelope (with Neptune's name on it) containing a $100 bill[5] (count III).

On January 3, 1975, GILLESPIE called STROHL and told him that he had a body for him. STROHL reassured GILLESPIE that he would give him the money—which had been set at $35 per body—upon delivery of the necessary paper work. STROHL concurred in the necessity for proceeding cautiously, stating, "I don't want anybody thinking that I have gotten to you."

On January 6, 1975, at approximately 10:30 a.m., STROHL and GILLESPIE met again at Tucker's Grove Park and had a face-to-face conversation in the car which was tape recorded, in which GILLESPIE told STROHL he had a body and gave STROHL documents purportedly relating to the body, and STROHL gave GILLESPIE $35 (count IV).

---

that you delivered to him?

"A [By GILLESPIE]: . . . we discussed an initial fee per case from $25 to $35 per case, initially, to start with, and then that the fee per case or per body would be subsequently renegotiated. . . .

"Q Now, could you tell the ladies and gentlemen of the jury specifically who mentioned the fee of $25 to $35 per case?

"A I believe Mr. Strohl did at that time."

[5]On December 20, 1974, when GILLESPIE returned a telephone call from STROHL, STROHL asked if he went by the post office box and got the money and stated there would be more money there after the first of the year.

GILLESPIE testified that later in the day he telephoned STROHL and told him the body had been claimed and was not available to him. STROHL said, "I'm damn glad we didn't have him cremated. We would have our tit in the wringer," and told GILLESPIE not to worry about the $35, to keep it and use it to pay off his pool table as there would be more bodies in the future,

STROHL met GILLESPIE at Tucker's Grove Park to return the documents GILLESPIE had given him and was arrested.

Defendant STROHL testified on his own behalf. On direct examination he denied any intent to bribe GILLESPIE. He testified that he "had developed a friendship with Gillespie that was a friendly . . . personally friendly basis, had nothing to do with business." He gave the money out of "generosity" to be used for GILLESPIE's wife's medical expenses. He also testified that it was GILLESPIE's idea that he give $35 per body.

On cross-examination he admitted that he knew it was not right to pay money to public officials and that he concealed the payments he made to GILLESPIE from Neptune Society officials except one female employee whom he told after he had made the payments.

## ISSUES

On appeal defendant STROHL contends (1) that Penal Code section 67, a felony (hereinafter Section 67), is too vague, indefinite and uncertain to satisfy due process standards and therefore unconstitutional and that the proper charge, if any, should have been violation of Penal Code section 67½, a misdemeanor (hereinafter Section 67½); (2) that he was denied a right to counsel at the pre-arraignment stage as provided in the Sixth Amendment to the United States Constitution; (3) that the introduction into evidence of the tape-recorded conversations constituted reversible error in that the electronic surveillance procedures employed violated his constitutional rights under the Fourth, Fifth, Sixth and Fourteenth Amendments; and (4) that he was entrapped as a matter of law.

## DISCUSSION

## DUE PROCESS

██ Defendant does not contend that the word "bribe"[6] is impermissibly vague but asserts that the words "executive officer" contained in

---

[6]Penal Code section 7, subdivision 6 states: "The word 'bribe' signifies anything of value or advantage, present or prospective, or any promise or undertaking to give any,

Section 67[7] (a felony) are impermissibly vague, indefinite and uncertain to satisfy due process standards and thus renders Section 67 unconstitutional. As a corollary to this argument, he urges that the proper charge, if any, should have been violation of Section 67½[8] (a misdemeanor) which pertains to bribing a "ministerial officer." We reject both of the above contentions as being unmeritorious.

■ The well settled general rules to be applied to criminal statutes in respect to procedural due process requirements pertinent to the case at bench are as follows:

■ That the statute must be sufficiently definite and certain that it gives fair warning sufficient to inform a person of ordinary or average intelligence, of what acts or omissions it declares to be prohibited and punishable. However, reasonable certainty, in view of the conditions, is all that is required.[9] (See *People* v. *Ali* (1967) 66 Cal.2d 277 [57 Cal.Rptr. 348, 424 P.2d 932]; *People* v. *Hallner* (1954) 43 Cal.2d 715 [277 P.2d 393]; *Eckl* v. *Davis* (1975) 51 Cal.App.3d 831 [124 Cal.Rptr. 685]; *Solander* v. *Municipal Court* (1975) 45 Cal.App.3d 664 [119 Cal.Rptr. 609]; *Tip Top Foods, Inc.* v. *Lyng* (1972) 28 Cal.App.3d 533 [104 Cal.Rptr. 718].)

■ ■ The construction of a statute by judicial decision becomes a part of it, and the standard thus established may be sufficient to satisfy the requirement of due process of law that one be given adequate warning of an offense with which he may be charged. Moreover, if the Legislature does not see fit to change the language of the statute, it must

---

asked, given, or accepted, with a corrupt intent to influence, unlawfully, the person to whom it is given, in his action, vote, or opinion, in any public or official capacity; . . ."

[7]Section 67 provides: "Every person who gives or offers any bribe to any executive officer in this State, with intent to influence him in respect to any act, decision, vote, opinion, or other proceeding as such officer, is punishable by imprisonment in the state prison not less than one nor more than 14 years, and is disqualified from holding any office in this State."

[8]Section 67½ states: "Every person who gives or offers as a bribe to any ministerial officer, employee, or appointee of the State of California, county or city therein or political subdivision thereof, any thing the theft of which would be petty theft is guilty of a misdemeanor; if the theft of the thing so given or offered would be grand theft the offense is a felony."

[9]Penal Code section 4 provides: "The rule of the common law, that penal statutes are to be strictly construed, has no application to this Code. All its provisions are to be construed according to the fair import of their terms, with a view to effect its objects and to promote justice."

be presumed that the Legislature is aware of the judicial construction and by its failure to amend the section has approved the decision as a statement of legislative intent. (See *Barrows* v. *Municipal Court* (1970) 1 Cal.3d 821 [83 Cal.Rptr. 819, 464 P.2d 483]; *People* v. *Hallner, supra; McDonald's Systems of California, Inc.* v. *Board of Permit Appeals* (1975) 44 Cal.App.3d 525, 540, fn. 13 [119 Cal.Rptr. 26]; *People* v. *Stamp* (1969) 2 Cal.App.3d 203 [82 Cal.Rptr. 598]; see also *People* v. *Obie* (1974) 41 Cal.App.3d 744, 754 [116 Cal.Rptr. 283]; *People* v. *Hirst* (1973) 31 Cal.App.3d 75, 79 [106 Cal.Rptr. 815]; *People* v. *Orser* (1973) 31 Cal.App.3d 528 [107 Cal.Rptr. 458]; *People* v. *Lustman* (1970) 13 Cal.App.3d 278, 287 [91 Cal.Rptr. 548].)

 Applying the foregoing rules of construction to the instant case and in view of the landmark 1954 California Supreme Court decision in *People* v. *Hallner, supra,* defendant's attack upon the ground of uncertainty in respect to the term "executive officer" in Section 67 is untenable. In *People* v. *Hallner, supra,* 43 Cal.2d at page 718, the court held that Section 67, prohibiting offering a bribe to an "executive officer in this State," includes "executive officers" of a city. Numerous California Supreme Court and appellate court decisions since 1954 have held that "executive officers" of various levels of local government, including the county level, as herein involved, come within Section 67. (See *infra.*)

In *Guillory* v. *Wilson* (9th Cir. 1968) 402 F.2d 34, the defendant was convicted of bribery under Section 67, having offered the police officer who arrested him for possession of heroin $1,500 to release him. The United States Court of Appeals, Ninth Circuit, in affirming the district court's denial of defendant's petition for habeas corpus, held that Section 67 was not unconstitutionally vague. The court stated at page 36: "The statute however does comply with constitutional requirements in that it does give a person of 'ordinary intelligence fair notice that his contemplated conduct is forbidden.' " (Citing *Bouie* v. *City of Columbia* (1964) 378 U.S. 347 [12 L.Ed.2d 894, 84 S.Ct. 1697]; *United States* v. *Harriss* (1954) 347 U.S. 612 [98 L.Ed. 989, 74 S.Ct. 808].)

 We turn to defendant STROHL's line of argument that his dealings with GILLESPIE were in his capacity as the Chief Deputy Coroner of Santa Barbara County, and in that capacity GILLESPIE did not qualify as an "executive officer" within the meaning of Section 67 (a felony) but was a "ministerial officer" within the meaning of Section 67½ (a misdemeanor).

■ Generally, whether the duties entrusted to a public officer are "executive" or "ministerial" in character turns on whether the duties to be performed are discretionary or imperative. In the former, the public servant is an "executive officer"; in the latter, a "ministerial officer."

In *Elder* v. *Anderson* (1962) 205 Cal.App.2d 326 [23 Cal.Rptr. 48], the court said at page 331: " '[W]here the law prescribes and defines the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment, the act is ministerial, but where the act to be done involves the exercise of discretion and judgment it is not to be deemed merely ministerial.' "

■ Here, clearly GILLESPIE in his capacity as *deputy sheriff* was an "executive officer" within the meaning of Section 67 by judicial construction. (See *People* v. *Hallner, supra,* 43 Cal.2d at page 717, president of the board of police commissioners, city attorney and the executive assistant city attorney; *People* v. *Jackson* (1954) 42 Cal.2d 540 [268 P.2d 6], policemen; *People* v. *Griffin* (1950) 98 Cal.App.2d 1 [219 P.2d 519], sheriff; *People* v. *Keyes* (1930) 103 Cal.App. 624 [284 P. 1096], district attorney; *People* v. *Anderson* (1925) 75 Cal.App. 365 [242 P. 906], city marshal; *Manss* v. *Superior Court* (1914) 25 Cal.App. 533 [144 P. 298], constable.)

We also hold that GILLESPIE in his capacity as *chief deputy coroner* was an "executive officer" within the meaning of Section 67. Although many of his functions in that capacity could be considered "imperative" in character, the "discretionary" power vested in him by legislative action in some predominate areas of his activities raises him to "executive" rather than "ministerial" status.[10]

---

[10]The Attorney General in 20 Ops.Cal.Atty.Gen. 143, at page 145, describes the discretionary power vested in the coroner in this manner: "In order to carry out the duties of his office in the investigation of death in accordance with the provisions of section 27491 of the Government Code and also in carrying out his duties with respect to making a certificate of death required by section 10425 of the Health and Safety Code, it is necessary that the Coroner have wide discretion. He may order an autopsy when, in his judgment, that is the appropriate means of ascertaining the cause of death. This he may do without the consent of the family of the deceased. . . . Within the area of his duties, the judgment of the Coroner governs. The action of the Coroner in this respect is qualified only by the implied limitation that he not be grossly unreasonable, arbitrary or capricious in the exercise of his discretion."

In addition, in *People* v. *Kerns* (1935) 9 Cal.App.2d 72 [48 P.2d 750], the court held a junior epidemiologist-bacteriologist of the Department of Public Health to be an "executive" officer. The word "inspector" was on his badge. His sole duties were to enforce quarantine regulations with regard to all birds of the psittacine family, because

The Government Code spells out the discretionary power of the coroner as follows: "The coroner shall have discretion to determine the extent of inquiry to be made into any death occurring under natural circumstances . . . ." (Gov. Code, § 27491.) "At the discretion of the coroner, or his appointed deputy," he may determine the amphetamine derivative contents of a person who was driving or riding in an automobile. (Gov. Code, § 27491.25.) "The coroner may also, in his discretion, if the circumstances warrant, hold an inquest . . . ." (Gov. Code, § 27491.6.) "The coroner, his authorized deputy, or a hearing officer shall conduct the inquest." (Gov. Code, § 27491.7.) "In any. action or proceeding in which the sheriff is a party, the coroner shall discharge the duties of sheriff." (Gov. Code, § 27469.) The coroner has the power to summon and examine witnesses "who in his opinion" have knowledge of the facts. (Gov. Code, § 27499.) "If the coroner is absent or unable to attend, the duties of his office may be discharged by any of his deputies with like authority . . . ." (Gov. Code, § 27530.) '

Moreover, arguendo, defendant STROHL cannot successfully urge that he was "dealing" with· GILLESPIE exclusively in his role as chief deputy coroner, even if that role be "ministerial" in character. GILLESPIE's badge designated him as both deputy coroner and deputy sheriff.' The evidence is clear that STROHL knew that GILLESPIE served in both capacities, his initial conversations with· GILLESPIE being in the sheriff's office. Thus, the bribes offered and given by STROHL to GILLESPIE, as hereinbefore related, had a two-fold purpose, namely, to influence GILLESPIE's official actions as chief deputy coroner to funnel him the bodies of deceased indigents for cremation and burial at sea and to buy his (STROHL'S) protection from arrest which GILLESPIE, in his capacity as deputy sheriff, should and could have made under the law.

Accordingly, by reason of the foregoing, we hold under the facts of the instant case that whether GILLESPIE is considered separately as a deputy sheriff or as chief deputy coroner or jointly in both capacities, defendant STROHL'S attempts to bribe GILLESPIE constituted bribery of

---

of an epidemic of fever and sickness among such birds, to sign shipping certificates when birds were to be shipped interstate, and to inspect aviaries for quarantine purposes.

By analogy, if a junior epidemiologist-bacteriologist with the foregoing duties pertaining to sick parrots is held to be an "executive" officer within the meaning of the bribery statute (Section 67), clearly, logic and reason dictate that a Chief Deputy Coroner with duties pertaining to humans, as in the instant case, must reasonably also be an "executive" officer within the meaning of Section 67.

an "executive" officer under Section 67 and defendant was properly prosecuted under that section.[11]

## RIGHT TO COUNSEL

 Defendant STROHL secondly contends that he was denied a constitutional right to counsel at the prearraignment stage, relying primarily on *Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199], and *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. This contention is without merit since the evidence in the instant case does not afford defendant the protective mantle of either *Massiah* or *Miranda.*

The principles expressed in *Massiah* do not apply in a preindictment setting (*People* v. *Murphy* (1972) 8 Cal.3d 349, 362 [105 Cal.Rptr. 138, 503 P.2d 594]), and defendant STROHL's right to counsel attached only after the information (or indictment) was filed. (See also *Hoffa* v. *United States* (1966) 385 U.S. 293, 309-310 [17 L.Ed.2d 374, 386-387, 87 S.Ct. 408]; *People* v. *Leach* (1975) 15 Cal.3d 419, 443 [124 Cal.Rptr. 752, 541 P.2d 296]; *People* v. *Mabry* (1969) 71 Cal.2d 430, 441 [78 Cal.Rptr. 655, 455 P.2d 759].)

---

[11]The clerk's transcript on appeal reflects that defendant was sentenced to state prison on each count, to run concurrently. Assuming, arguendo, that Chief Deputy Coroner GILLESPIE was a "ministerial" officer, making Section 67½ the appropriate section under which defendant STROHL should have been prosecuted, he still committed a felony under Section 67½, since it concludes "if the theft of the thing so given or *offered* would be *grand theft* the offense is a felony." (Italics added.)

Here, the evidence shows defendant STROHL initially *offered* GILLESPIE $1,000 in exchange for a personal note which he would "tear up" in furtherance of his scheme to obtain an exclusive contract to handle bodies of the 200 to 300 indigents who die annually in Santa Barbara County.

The record discloses that under the scheme Neptune Society would have to bill the County of Santa Barbara at the rate of $250 per body, or a total of between $50,000 to $75,000 annually, and GILLESPIE would have received between $7,000 to $10,500 annually at the payoff rate of $35 per unit (body).

Moreover, STROHL testified at trial that he knew it was wrong to give money to public officials. The whole course of his secretive conduct and statements bears this out. He met with GILLESPIE at Tucker Grove Park on five occasions at a time in the season when they were too early to view the daffodils and too old to use teeter-totters, where STROHL on one occasion gave GILLESPIE a $100 bill, literally "under the table." His statements to GILLESPIE included such remarks as offering a "deal" to GILLESPIE; that a note for $1,000 be given to him by GILLESPIE as "something to cover both of us" which he would "tear up"; that a post office box be used for payoffs because "the less my face is seen out there, the better off it would be"; that "I better pay you in cash for your own good"; and "I don't want anybody thinking that I have gotten to you." The foregoing secretive conduct and statements by STROHL show guilty knowledge on his part, negating his claim of lack of fair warning.

The *Miranda* decision was directed at "custodial interrogation." The United States Supreme Court in *Hoffa* v. *United States, supra,* 385 U.S. 293, in rejecting a similar contention in respect to the necessity of a *Miranda* warning during the investigative stage, stated at page 310 [17 L.Ed.2d at p. 386]: "Nothing in . . . any other case that has come to our attention, even remotely suggests this novel and paradoxical constitutional doctrine, and we decline to adopt it now. There is no constitutional right to be arrested. The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction." (See also *People* v. *Farley* (1971) 19 Cal.App.3d 215 [96 Cal.Rptr. 478]; *People* v. *Martin* (1970) 2 Cal.3d 822 [87 Cal.Rptr. 709, 471 P.2d 29].)

In the instant case, although suspicion had apparently focused on STROHL at the time of the above referred to conversations, he (STROHL) was unaware of any investigation and he was in no manner deprived of his freedom of action. His statements were all voluntary and he was entirely free to refrain and refuse to discuss with Norton or GILLESPIE his scheme to obtain an exclusive contract to dispose of the bodies of indigent deceased from Santa Barbara County through illegal means. The conversations were not in the form of interrogation as such; he spoke as freely to GILLESPIE as he would an accomplice; and his statements were spontaneous and voluntary.

Thus, although STROHL was not represented by counsel during the face-to-face and telephone conversations he had with Deputy Norton and GILLESPIE, he did not have a constitutional right to counsel during those conversations because they preceded his being taken into custody on January 6, 1975, and were before any formal charges were lodged.

### ADMISSIBILITY OF THE TAPE RECORDINGS

The court below, over the objection of defendant, admitted into evidence the tape-recorded conversations between defendant STROHL and GILLESPIE some of which were played to the jury in open court. Defendant on appeal assigns as reversible error the admission of the

tapes into evidence, asserting that since suspicion had focused on him before the first tape recording was made, which was without prior higher authorization or court approval, and since he was without benefit of legal counsel and did not consent to the surreptitious recordings, his Fourth, Fifth, Sixth and Fourteenth Amendment rights were violated. He also contends that the recordation of his conversations with GILLESPIE violated federal and state statutes, namely, title III of the Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. §§ 2510-2520) and California Penal Code sections 630-637.2.

We disagree and hold the procedures employed in the instant case were proper and did not violate defendant's constitutional rights or federal and state statutes.

Similar issues were raised and disposed of by the California Supreme Court in *People* v. *Murphy, supra,* 8 Cal.3d 349, cert. den. (1973) 414 U.S. 833 [38 L.Ed.2d 68, 94 S.Ct. 173].

The court in *People* v. *Murphy, supra,* noted at page 359 that the requirements outlined in *Katz* v. *United States* (1967) 389 U.S. 347, 352 [19 L.Ed.2d 576, 582, 88 S.Ct. 507], relied on by defendant STROHL in the instant case, were intended to protect such persons only from the "uninvited ear," not from a breach of trust by one of the parties to the conversation.

The *Murphy* court, citing *Hoffa* v. *United States,*[12] *supra,* 385 U.S. 293; *Lopez* v. *United States*[13] (1963) 373 U.S. 427, 439 [10 L.Ed.2d 462,

---

[12]"In *Hoffa* a former associate of the defendant turned informer in exchange for leniency on criminal charges pending against him. At the suggestion of federal authorities the informer obtained an invitation to confer with the defendant in his hotel suite about certain matters. The informer later reported incriminating statements made by the defendant which helped convict him." (8 Cal.3d at p. 359, fn. 8.)

[13]"In *Lopez* the petitioner attempted to bribe an Internal Revenue Agent to avoid a certain tax liability. The agent pretended to accept the bribe and in a second meeting, during which the agent was equipped with a transmitter and pocket recorder, discussed the payoff with the petitioner and recorded the conversation." (8 Cal.3d at p. 359, fn. 8.)

The *Lopez* Court stated at page 439: "Stripped to its essentials, petitioner's argument amounts to saying that he has a constitutional right to rely on possible flaws in the [internal revenue] agent's memory, or to challenge the agent's credibility without being beset by corroborating evidence that is not susceptible of impeachment. For no other argument can justify excluding an accurate version of a conversation that the agent could testify to from memory. We think the risk that petitioner took in offering a bribe to [the agent] fairly included the risk that the offer would be accurately reproduced in court, whether by faultless memory or mechanical recording." (373 U.S. at p. 439 [10 L.Ed.2d at p. 471].)

470-471, 83 S.Ct. 1381]; *On Lee* v. *United States*[14] (1952) 343 U.S. 747 [96 L.Ed. 1270, 72 S.Ct. 967]; and *United States* v. *White*[15] (1971) 401 U.S. 745 [28 L.Ed.2d 453, 91 S.Ct. 1122], pointed out that *Katz* did not indicate that a defendant has a constitutionally protected expectation that a person with whom he is conversing will not then or later reveal the conversation to the police. Moreover, the court perceived no distinction between the risk one faces that the person in whom he confides will later breach the trust by testifying about the conversation and the risk that such person has already betrayed him and is instantaneously transmitting their conversations electronically to police equipped with radio receivers.

Moreover, the California Supreme Court in *People* v. *Murphy, supra,* 8 Cal.3d 349, making no distinction between face-to-face and telephone conversations, noted at page 359, footnote 9, that the United States Supreme Court has held that one party to a telephone conversation may constitutionally allow another to listen to it, citing *Rathbun* v. *United States* (1955) 355 U.S. 107 [2 L.Ed.2d 134, 78 S.Ct. 161]; *Rogers* v. *United States* (10th Cir. 1966) 369 F.2d 944, 946; *United States* v. *Ballou* (2d Cir. 1965) 348 F.2d 467, 468; and *Lindsey* v. *United States* (9th Cir. 1964) 332 F.2d 688, 691. The court said: "This view is also supported by title III of the Omnibus Crime Control and Safe Streets Act of 1968. (18 U.S.C. § 2511(2)(c).)"

■ We hold the recordings of STROHL's conversations with GILLESPIE were also proper under California statutory law. Penal Code section

---

[14]"In *On Lee* an old acquaintance and former employee of the defendant, who had become an undercover agent for the Bureau of Narcotics, engaged the petitioner in a conversation during which petitioner made incriminating statements. The agent was wearing a microphone which transmitted the conversation to agents who were stationed outside with a receiving set. The conversation was recorded and later helped to obtain petitioner's conviction." (8 Cal.3d at p. 359, fn. 8.)

[15]The *White* court stated: "Inescapably, one contemplating illegal activities must realize and risk that his companions may be reporting to the police. If he sufficiently doubts their trustworthiness, the association will very probably end or never materialize. But if he has no doubts, or allays them, or risks what doubt he has, the risk is his. In terms of what his course will be, what he will or will not do or say, we are unpersuaded that he would distinguish between probable informers on the one hand and probable informers with transmitters on the other. Given the possibility or probability that one of his colleagues is cooperating with the police, it is only speculation to assert that the defendant's utterances would be substantially different or his sense of security any less if he also thought it possible that the suspected colleague is wired for sound. At least there is no persuasive evidence that the difference in this respect between the electronically equipped and the unequipped agent is substantial enough to require discrete constitutional recognition, particularly under the Fourth Amendment which is ruled by fluid concepts of 'reasonableness.' " (401 U.S. at pp. 752-753 [28 L.Ed.2d at p. 459].)

633.5 (added by Stats. 1967) provides in pertinent part: "Nothing in Section 631 or 632 shall be construed as prohibiting one party to a confidential communication from recording such communication for the purpose of obtaining evidence reasonably believed to relate to the commission by another party to such communication of the crime of extortion, kidnapping, *bribery*, . . . and nothing in Section 631 or 632 shall be construed as rendering inadmissible in a prosecution for extortion, kidnapping, *bribery*, . . . or any crime in connection therewith, any evidence so obtained." (Italics added.)

Here, the one party to the conversations, namely, GILLESPIE, a deputy sheriff and chief deputy coroner, consented to the tapings to obtain evidence reasonably believed to relate to the crime of bribery being committed by STROHL.

In respect to defendant STROHL's claimed violation of his Fifth Amendment right, "Although suspicion had focused on defendant at the time of the recordations in the instant case he was not deprived of his freedom of action in any significant way. His statements were voluntary and he was entirely free to refuse to engage" (*People* v. *Murphy, supra,* 8 Cal.3d at p. 362) in the conversations with GILLESPIE.

Defendant STROHL's claimed violation of his Sixth Amendment right to counsel has hereinbefore been discussed and disposed of as unmeritorious.

## ENTRAPMENT

Defendant STROHL's final contention on appeal is that he was entrapped as a matter of law. He argues that he originally sought information from GILLESPIE as to the names of Santa Barbara County officials he could contact to establish the Neptune Society in business in Santa Barbara County, which was completely proper, but that instead GILLESPIE put him in contact with undercover agents and lured him into his plight by fostering a friendly relationship and stressing that he (GILLESPIE) needed money for his wife's medical expenses which constituted entrapment as a matter of law.

"Entrapment" is the conception and planning of an offense by an officer and his procurement of its commission by one who would not have perpetrated it except for the trickery, persuasion or fraud of the officer. (*People* v. *Herrera* (1959) 171 Cal.App.2d 551 [340 P.2d 690].)

█ It is unquestionably the law that the government is estopped by public policy from prosecuting a defendant under circumstances where decoys are used to ensnare the innocent and law-abiding into the commission of crime when the criminal design did not originate with the accused but is conceived in the minds of officers and the accused is by persuasion, deceitful representation or inducement lured into the commission of a criminal act.

However, entrapment as a matter of law is not established where there is any substantial evidence in the record, direct or circumstantial, from which it may be inferred that the criminal intent to commit the particular offense originated in the mind of the accused. (See *People* v. *Moran* (1970) 1 Cal.3d 755 [83 Cal.Rptr. 411, 463 P.2d 763]; *People* v. *Sweeney* (1960) 55 Cal.2d 27 [9 Cal.Rptr. 793, 357 P.2d 1049]; *People* v. *Adams* (1971) 21 Cal.App.3d 972 [99 Cal.Rptr. 122].)

█ Here, the trial court instructed the jury[16] in respect to the defense of entrapment and by its verdict of guilty, the jury implicitly rejected it. We have recounted in some detail the testimony of two key prosecution witnesses, Deputy Robert Norton and GILLESPIE, concerning their telephone and face-to-face conversations with STROHL up to the time of his arrest on January 6, 1975.

Viewing the record in the light most favorable to the People, as we are bound to do following a guilty verdict (*People* v. *Vann* (1974) 12 Cal.3d 220 [115 Cal.Rptr. 352, 524 P.2d 824]; *People* v. *Culver* (1973) 10 Cal.3d 542 [111 Cal.Rptr. 183, 516 P.2d 887]; *People* v. *Peterson* (1973) 9 Cal.3d

---

[16]The trial court instructed the jury in respect to the defense of entrapment as follows:

"A person is not guilty of crime when he commits an act or engages in conduct, otherwise criminal, when the idea to commit the crime did not originate in the mind of the defendant but originated in the mind of another and was suggested to the defendant for the purpose of inducing him to commit the crime in order to entrap him and cause his arrest." (CALJIC No. 4.60.)

"When law-enforcement officers are informed that a person intends to commit a crime, the law permits the officers to afford opportunity for the commission of the offense, and to lend the apparent cooperation of themselves or of a third person for the purpose of detecting the offender. When officers do this, if the suspect himself, originally and independently of the officers, intends to commit the acts constituting a crime, and if he does acts necessary to constitute the crime, he is guilty of the crime committed. He has no defense in the fact that an officer or other person engaged in detecting crime was present and provided the opportunity, or aided or encouraged the commission of the offense." (CALJIC No. 4.61.)

"The defendant has the burden of proving by a preponderance of the evidence that he was entrapped into the commission of the crime. Preponderance of the evidence means such evidence as, when weighed with that opposed to it, has more convincing force and the greater probability of truth." (CALJIC No. 4.63.)

717 [108 Cal.Rptr. 835, 511 P.2d 1187]; *People* v. *Sweeney, supra,* 55 Cal.2d 27; *People* v. *Blackwell* (1975) 45 Cal.App.3d 804 [119 Cal.Rptr. 768]), we note the record reflects that the first conversation in point of time relevant to the issue of entrapment, occurred between Deputy Robert Norton (who used the name "Bob Justin," posing as a representative of another mortuary establishment) and defendant STROHL in the salon of the Neptune Society's yacht *Cheyenne* on November 2, 1974. Deputy Norton testified that he attended the Neptune Society's boat cruise in connection with the Dudley matter and possible involvement of coroner officials of counties other than Santa Barbara. The record reflects that it was defendant STROHL who volunteered to Deputy Norton, before STROHL met with GILLESPIE on November 4, 1974, to discuss payoffs, that he (STROHL) was going to meet with Chief Deputy Coroner GILLESPIE the following Monday and that "he was going to offer GILLESPIE $500 or a color TV" as he needed his "help and expertise." Deputy Norton did not attempt to persuade or lure STROHL into his criminal design but, to the contrary, warned him (STROHL) that the best way to approach GILLESPIE would be to do it legally. Defendant STROHL did not heed this advice but said that "he would rather pay Larry than somebody else to keep it in the family."

In addition, Deputy Norton testified that during his telephone conversation with STROHL on November 4, 1974, following STROHL's meeting with GILLESPIE on the same day, in which payoffs were discussed, that STROHL "Brought out that Larry had—he had approached Larry, made Larry a proposition and Larry told him that he would have to think about it. Larry went home and in turn called Mr. Strohl back at a later time and Mr. Strohl told me that he was under the opinion that Larry would go the whole bit, the whole route, he would go all the way. Those would be quotes. . . ." The above was corroborated by GILLESPIE's testimony.

We hold that the above unsolicited statements by STROHL to Deputy Norton on November 2, 1974, and November 4, 1974, constitute substantial evidence to support the jury's finding that the criminal intent to commit the bribery, as charged, originated in the mind of defendant STROHL and not Norton, GILLESPIE or other police officials.

The judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied May 14, 1976.