Filed 11/23/20  P. v. Hanner CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. BARRY WAYNE HANNER, Defendant and Appellant. | F077318 (Super. Ct. No. BF165211A) **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Michael E. Dellostritto, Judge.

Jonathan D. Roberts, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters and Gerald A. Engler, Chief Assistant Attorneys General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary, and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Barry Wayne Hanner (defendant) stands convicted, following a jury trial, of grand theft by false pretenses (Pen. Code,[1] § 532; count 1) and contracting without a license (Bus. & Prof. Code, § 7028; count 3), a misdemeanor.[2] Following a bifurcated court trial, he was found to have served three prior prison terms. (§ 667.5, former subd. (b).) Pursuant to section 1170, subdivision (h), he was sentenced to county jail for six years, to be served as a split sentence of three years in custody followed by three years of mandatory supervision. He was also ordered to pay various fees, fines, and assessments.[3]

On appeal, we hold defendant is not entitled to reversal of his conviction on count 3 based on either insufficiency of the evidence or instructional error. We conclude, however, that the prior prison term enhancements imposed with respect to count 1 must be stricken. Accordingly, we will affirm the convictions but vacate the sentence and remand the matter for resentencing, at which time defendant can raise his claim of inability to pay fees, fines, and assessments, should he wish to pursue it. Defendant's claim the trial court impermissibly used the prior convictions both to impose the upper term and as enhancements, is moot.

---

[1] Further statutory references are to the Penal Code unless otherwise stated.

[2] Count 2 of the information, which charged defendant with grand theft (§ 487, subd. (a), was dismissed during trial upon motion of the prosecutor.

[3] Defendant also had another case that was before the court at the time of sentencing. As it was not listed in his notice of appeal, we do not discuss it further, except to note defendant was also ordered to pay fees, fines, and assessments in that matter.

## FACTS

### *The Charged Offenses*

In August 2014, J.O. and her husband, O.O., purchased a newly built house in Bakersfield.[4]  When they and their children moved in, in early September, the front yard was landscaped, but the back yard was just bare dirt with a fence around it.  The couple was not actively seeking a contractor to finish the back yard.

On Saturday, October 4, the doorbell rang.  Defendant and Greg M., with whom the O.'s were unacquainted at the time, were outside.  Defendant, who did most of the talking, said they were contractors and had done a lot of work for people in the neighborhood.  He said they had a lot of contracts lined up and offered to give the O.'s a "wonderful deal."  He showed them a flyer, along with a white folder he called his portfolio.  It contained photographs of different kinds of yard work such as patios and play sets, like professional contractor work.  According to J.O., defendant said he owned the company listed on the flyer and had been doing that kind of work for over 30 years.[5] He said he did concrete work, patio, pool, and landscaping, and could even put in a swing set and play area for the children.  The O.'s told defendant what they wanted done, which included a concrete slab behind the house, a patio, a parking area for a recreational vehicle, a portion of the fence converted to a gate for the recreational vehicle, irrigation, curbing, gravel, a play area with a swing set and sand, water repellant for the fence and house, and a rain gutter for the patio.  Defendant said he would draft a proposal showing what he would do and how much it would cost.  Defendant had paperwork that allowed a

---

[4]    Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names and/or initials.  No disrespect is intended.

Undesignated dates in the statement of facts are from the year 2014.

[5]    According to O.O., defendant said he was a contractor.  O.O. assumed he owned the company.  Throughout their dealings, defendant said he was a contractor a number of times.  O.O. believed defendant was licensed, because he presented himself as A&J Concrete, which had a license number as shown on the flyer.

credit check so the O.'s could qualify for a loan. The O.'s filled it out, but did not sign a contract at that point because they were still deciding whether to get the work done.

Defendant and O.O. had some telephone conversations in which they negotiated what work was to be performed and the price. J.O. recalled defendant and Greg M. returning to the O. residence on November 8 with loan approval, but the O.'s decided they did not want to take out a loan. Defendant took measurements, and wrote on a piece of paper what the O.'s wanted done and how the payments were to be made.[6] When defendant finished writing the agreement, the O.'s both signed. J.O. saw the name of Adan H. on the agreement, but she did not know when the name was placed there. At the time the contract was signed, O.O. had not had any contact with Adan H., although he had seen that name on the flyer. Defendant said Greg M. would be the foreman.

The agreed-upon price was $17,500. Defendant asked for 40 percent to start the project, so J.O. wrote a check for $7,000 made out to defendant at his direction, then, at his request, accompanied him to the bank so the bank would not delay the check and the project could start right away.

Defendant and Greg started work at the house the next day. After that, J.O. sometimes saw defendant at the house, directing people who were working on the project.

The concrete was poured on November 15. Defendant was there initially. J.O. saw Adan H. for the first time that day. It was time to write the next check, for 30 percent of the project cost. Defendant told J.O. to make the check out to Adan. J.O. did so, then handed the check to defendant. The check, which was dated November 15,

---

[6] O.O. recalled defendant and Greg M. returning to the house on October 12 with a proposal that was already written. He agreed that the date on the document — November 8 — was the date he and J.O. signed the contract.

4.

2014, was for $5,250.[7]  O.O. spoke with Adan for the first time that day.  Adan said he was a contractor and the one who was supposed to pour the concrete.

The day the concrete was poured, J.O. questioned how and whether some of the work the O.'s wanted was being done.  Defendant assured her it was being done correctly.  After that, the O.'s each spoke with defendant by telephone and/or in person a number of times about things that did not look right or were not getting done.  The contract specified a completion date of November 30.  Defendant became irritated.  He said he had charged too little and was running out of money, and without more money, he could not continue with the work.  O.O. said that if they were going to give defendant more money, they needed to have a timeline for the job.  Eventually, defendant said he was not going to talk to them anymore, and they would have to go through Greg M. from then on.

On December 8, defendant presented O.O. with a written amendment to the contract.  The document specified the job would start "ASAP" with a third drawn check of $3,500.  All landscaping would be done by December 24, with the job finished by January 9, 2015.  The final payment of $1,750 was to be made upon completion of the project.  The amendment had the name "Adam" H. hand printed in the space following "Respectfully submitted," with the initials "G.M." next to it.

The O.'s did not sign the amendment.  Nevertheless, J.O. wrote a check, dated December 8, in the amount of $3,500.  She was on her way to work and left it for O.O. Because she did not know to whom to write the check, she left the payee blank.  Neither she nor O.O. knew who wrote Adan's name there.  O.O. gave the check to defendant. J.O. did not see anyone working at the house after that check was written.  However, O.O. came home one day and found someone walking on the fence.  When O.O. asked

---

**7**     According to O.O., the concrete was poured a couple of days later, after defendant was given the check and the check cleared the bank.

what he was doing, the person said he had come to put in gates. When O.O. asked what kind of gates, the person's response did not make sense, so O.O. told the person to go and bring defendant, because the person was damaging the property and not doing what O.O. had agreed upon with defendant. Two days later, defendant came to the house and screamed at O.O. about how defendant sent people and O.O. did not allow them to work. After that, communication between the O.'s and defendant stopped. Defendant never contacted them to try to finish or fix the work or to pay them back.

Adan H. was a concrete mason. He became a contractor in 2011. A general contractor was someone who did everything in construction. A subcontractor did specific types of the work, such as electrical or concrete. Adan was a subcontractor who sometimes was hired by a general contractor.

In October and November of 2014, Adan had a business called A&J Concrete Plus Tree Services. He had a contractor's license. He did not do much advertising. The business never had paper flyers. He did not create, or give anyone permission to create or to use his information on, the flyer given to the O.'s, which advertised "A & J Concrete" and "A & J Tree Service" and incorrectly gave his first name as "Adam." The company name was incorrect, although the flyer contained Adan's correct telephone and contractor's license numbers.

Adan was acquainted with defendant, although defendant was never his employee. Defendant did not have Adan's permission to use Adan's contractor license number or business's name to obtain work, or to bid on work for Adan's business. Greg M. did not work for Adan.

Adan did not write the proposal submitted to the O.'s. He denied writing his name on the proposal. The signature that purported to be his looked like his signature, but he did not remember signing the document. He first became aware of it when he finished his concrete work, and the client asked about the patio and showed him the paper. Defendant did not have permission to write the document on Adan's behalf or to create a

6.

contract with the clients to perform work under Adan's license number. Adan only performed some work at the O. residence because defendant told him about a customer who wanted some concrete work done. Adan did not act as defendant's subcontractor.[8]

Adan was paid by the homeowners for the work he did, and he cashed both checks, one of which was for sprinkler work. Later, Adan was penalized by the contractors board for doing the sprinkler work, which his license did not authorize him to do. His license expired for various reasons on April 30, 2016.

Jeff Schulte, a licensed general contractor, was a senior inspector for the Contractors' State License Board (CSLB). As such, he determined whether items listed in homeowners' complaints met industry standards. In this capacity, he inspected the O. premises in July 2015. A number of items did not meet the industry standard of supplying and installing all items specified in the contract and on the plans. Other items were done incorrectly.

On October 6, 2015, a search was conducted of the records of the CSLB. No record was found to indicate "Barry Wayne Hanner[/]A&J Concrete Plus Tree Service" (boldface, underscoring & some capitalization omitted), at a specified address, was licensed as a California contractor during the period of January 1, 2014, to October 6, 2015.

### *The Prior Acts*

In October 2006, Vicki M. owned a home in Bakersfield. She was thinking of doing some home improvement. Defendant came to her home with a flyer. He wanted to sell her windows to upgrade the windows already in the home. When she said she did not have the money, he suggested she refinance the home and recommended someone. She was able to refinance the home and do some upgrading.

---

**8**      The O.'s subsequently told an investigator for the district attorney's office that whenever defendant had an argument with them, he would call Adan on the telephone. They did not say how they knew with whom defendant was talking.

Defendant returned later and said he could install air conditioning for her. Vicki discussed specifics and price with him, and he prepared an invoice. She gave him a check that day (Jan. 23, 2007) for $5,000 as a down payment toward purchase of the air conditioning unit. On January 26, 2007, she gave defendant a check for $2,500 for installation fees and other costs.

On February 24, 2007, Vicki left defendant another check for $2,500. This was to be the check for completion of the project. When she returned home from work that day, the check was gone but the air conditioning unit was not installed. She telephoned defendant, and it was clear he was traveling somewhere. When she asked where the air conditioning was, he said he could not install it because a mouse got into the machinery and so he had to get a new unit. Vicki realized she needed to call the police. She also tried to stop payment on the check, but it was too late. She never spoke to defendant again, and never got her air conditioner or her money back.

On November 27, 2007, Bakersfield Police Detectives Brown and Berrera interviewed defendant in connection with Vicki's complaint. Defendant related that in the latter part of 2006, he had worked for AAA Windows. His manager was a contractor. Defendant said his job was to solicit contractor work, remodeling, roofing, heating, air conditioning, and painting. Defendant said he had worked there for approximately six months, until he was terminated on December 27, 2006.

Defendant said he had spoken to Vicki about installing an air conditioning/heating unit. She did not have the money for the job initially, and he helped her obtain a loan. In January and February 2007, he received three checks, totaling $10,000, from her. Defendant admitted that despite receiving this money, the air conditioning unit was never purchased and the project was not completed. Defendant said he used the funds to get a hotel, and for food, child support, and other expenses. He said the rest of the money had been "pissed away."

8.

Defendant said that when he returned to do the job and collect the money, he no longer worked for AAA Windows or its contractor. He continued to use flyers for AAA Windows, because he had spent "at least a couple thousand dollars" on some that he could use for door-to-door solicitation, and he wanted to get the best use of his expenditures. As a result, he continued to distribute the flyers even after he stopped working there.

In May 2012, Susan G., who resided in Bakersfield, was thinking of doing some home improvement. Around that time, defendant came to her door and said he could do patio covers more cheaply than the people from whom she had just received a bid. He gave her a flyer that had "Barry Hanner" and "Integrity Construction," as if they were one and the same. The flyer also had a contractor's license number. That was significant to Susan, because it meant she could check online to make sure defendant was who he said he was and knew what he was doing. She looked online and found out Integrity Construction was a real company with a real license number.

Defendant contacted his brother. Bringing his brother in made Susan feel more comfortable and more trusting. She talked to them about roofing, as she had been trying to find someone to redo her roof and paint the house. Defendant said he had a roofer and that Integrity Construction was a roofing company. After a couple of meetings, Susan hired them. Someone named Vincent, from Integrity Construction, came and did the roof. After the roof was finished, Susan and defendant entered into a further agreement for installation of an air conditioning unit.

During the course of May and June 2012, Susan wrote eight checks to defendant or his brother. All the money went to them, not Integrity Construction. The roof was done well. The house got painted, but not as specified and not correctly. The air conditioner was not installed, and the patio covers were not done. When Susan telephoned defendant, defendant said there had been a death in the family, and they were grieving and suffering. He said he would come and finish at some point, but he never

did.  Susan telephoned him again, and he said he was going to New Mexico to pick up his nephew and would contact Susan.  He never did.  When she tried telephoning him again, he stopped taking her calls.  He neither contacted her to finish the work nor repaid any of her money.

Vincent Q. held a general contractor's license.  He had been a building contractor, doing business as Integrity Construction, since 1998.  As of 2012, he did no advertising except for being in the Yellow Pages.  He obtained jobs through the Yellow Pages and client referrals.  He never created flyers or gave anyone permission to do so.  Nobody named "Hanner" was associated with Integrity Construction.  In 2012, he did work for defendant under a contract with defendant.  It was Vincent's understanding that defendant got customers loans for the work, then hired Vincent to do the work.  Vincent was paid by defendant.  Vincent did not become aware that someone created a flyer with Integrity Construction on it until a customer contacted him.  Defendant never had permission to use Vincent's contractor's license number, name, or company's name.  The contracts with Susan were handwritten.  Contracts for Vincent's company all were completely typed.  Defendant did not have permission to write the contracts on behalf of Vincent's company.

Defendant asked Vincent for an estimate to do the roof and painting at Susan's house.  The two entered into a contract for those jobs.  Vincent subcontracted the roof to another company and had a painter paint the home's exterior.  Vincent never made a contract with Susan, although she may have paid the roofer.

## DISCUSSION

### I

#### SUFFICIENCY OF THE EVIDENCE

Defendant was convicted, in count 3, of violating Business and Professions Code section 7028, which makes it unlawful "for a person to engage in the business of, or act in the capacity of, a contractor" if "[t]he person is not licensed . . . ."  (Bus. & Prof. Code,

§ 7028, subd. (a)(1).) Defendant contends this conviction must be reversed, because there was insufficient evidence to show he lacked a contractor's license.

The test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) Substantial evidence is that evidence which is "reasonable, credible, and of solid value." (*People v. Johnson*, *supra*, at p. 578.) An appellate court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Reilly* (1970) 3 Cal.3d 421, 425.) An appellate court must not reweigh the evidence (*People v. Culver* (1973) 10 Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 367). "If the circumstances reasonably justify the [trier of fact's] findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. [Citations.]" (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) Instead, reversal is warranted only if "it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) This standard of review is applicable regardless of whether the prosecution relies primarily on direct or on circumstantial evidence. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1125.)

Relying on the so-called "rule of convenience," the Attorney General says the burden was on defendant to show he possessed a contractor's license. "The rule of convenience 'emerged from a long line of decisions which operate to impose on a defendant the burden of proving an exonerating fact if its existence is "peculiarly" within his personal knowledge and proof of its *non*existence, by the prosecution, would be relatively difficult or inconvenient. [Citations.]' [Citation.] [¶] . . . [¶] . . . [A]

11.

defendant has a burden of producing a license when a license would act as a complete defense." (*In re Shawnn F.* (1995) 34 Cal.App.4th 184, 197-198 [driving without a license]; accord, e.g., *People v. Boo Doo Hong* (1898) 122 Cal. 606, 608-609 [practicing medicine without a license]; *People v. Yoshimura* (1979) 91 Cal.App.3d 609, 625-626 [possession of explosives without a permit]; *People v. Marschalk* (1962) 206 Cal.App.2d 346, 349-350 [possession of narcotics without a prescription]; *People v. Fortch* (1910) 13 Cal.App. 770, 775 [practicing dentistry without a license]; *People v. Flores* (1976) 62 Cal.App.3d Supp. 19, 22-23 [doing business as a carrier without a license].)

Defendant says this rule should not apply here, because by proposing the jury instruction that placed the burden of proof on the People, the prosecution affirmatively accepted that burden and forfeited any claim the burden lay with defendant.**9** The United States Supreme Court has held that "when a jury instruction sets forth all the elements of the charged crime but incorrectly adds one more element, a sufficiency challenge should be assessed against the elements of the charged crime, not against the erroneously heightened command [concerning what the government must prove] in the jury instruction." (*Musacchio v. United States* (2016) 577 U.S. ___, ___ [136 S.Ct. 709, 715].) Defendant says applying the rule here creates a due process notice problem, since, under the circumstances, he was never notified the burden of producing the license was on him.

Although the parties' arguments raise an interesting issue, we need not resolve it, since substantial evidence supports the conviction regardless of who had the burden. In reaching this conclusion, we consider all the evidence — including defendant's prior acts,

---

**9**     Special Instruction No. 1, which was drafted by the People, stated, in part, that to prove defendant was guilty of the crime charged in count 3, "the People must prove that: [¶] 1. The defendant willfully engaged in the business of contracting; [¶] 2. The defendant did not have a contractor's license; and [¶] 3. The location of the job site was in the state of California."

which jurors were instructed could be considered with regard to whether defendant had the requisite intent for count 1 and whether he had a plan or scheme to commit the charged offenses — in the light most favorable to the prosecution, and all logical inferences to be drawn therefrom. (*Musacchio v. United States*, *supra*, 577 U.S. at p. ___ [136 S.Ct. at p. 715]; *People v. Ceja* (1993) 4 Cal.4th 1134, 1139; see *People v. Marshall* (1997) 15 Cal.4th 1, 36.) Although the certified document reflecting the result of the search of the CSLB's records did not preclude the possibility defendant could have held a license under a different business name, the evidence showed defendant held himself out as possessing contractor's license numbers that, while legitimate, were not his and that he did not have permission to use. A reasonable inference is that he would not have appropriated other people's contractor's license numbers if he himself held a valid license.

## II

### ALLEGED INSTRUCTIONAL ERROR

In addition to the language set out in footnote 9, *ante*, Special Instruction No. 1 contained the following provision: "A contractor includes, but is not limited to, any person who is a consultant to an owner, builder or company *or* who undertakes, offers to undertake, purports to have the capacity to undertake or submits a bid to any home improvement project or part thereof." (Italics added.)[10] Defendant acknowledges the definition is taken from statutory language, but argues that "includes, but is not limited to," rendered the instruction impermissibly broad and vague. Because such a broad definition allowed jurors to provide their own definition of a contractor, the argument runs, the instruction failed adequately to define an essential element of the charged crime; hence, reversal is required.

---

[10] The written instruction, which jurors had with them during deliberations, omitted the italicized "or."

We apply the independent standard of review in assessing whether instructions correctly state the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

For purposes of Business and Professions Code, division 3, chapter 9, of which section 7028 of that code is a part, " 'Contractor,' . . . is synonymous with 'builder' and, . . . a contractor is any person who undertakes to or offers to undertake to, or purports to have the capacity to undertake to, or submits a bid to, or does himself or herself or by or through others, construct, alter, repair, add to, subtract from, [or] improve, . . . any . . . project, development or improvement, or to do any part thereof . . . . 'Contractor' includes subcontractor and specialty contractor." (Bus. & Prof. Code, § 7026.) "The term 'contractor' includes all of the following: [¶] . . . [¶] (2)(A) Any person, consultant to an owner-builder, firm, association, organization, partnership, business trust, corporation, or company, who or which undertakes, offers to undertake, purports to have the capacity to undertake, or submits a bid to construct any building or home improvement project, or part thereof." (*Id*., § 7026.1, subd. (a).)

In light of these statutory definitions, the challenged portion of Special Instruction No. 1 correctly stated the law. Even the "includes, but is not limited to," language technically was correct, as the instruction set out the portions of the definitions that were responsive to the evidence adduced at trial, but the statutory definitions went beyond that evidence. " 'A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' [Citation.]" (*People v. Coddington* (2000) 23 Cal.4th 529, 603, superseded by statute on another ground as stated in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1107, fn. 4 & overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13; accord, *People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012.) Defendant did not do so here. Accordingly, his claim has been forfeited. (*People v. Lee* (2011) 51 Cal.4th 620, 638; *People v. Coddington*, *supra*, 23 Cal.4th at p. 603.)

Defendant says if we conclude his trial counsel should have objected or requested a proper instruction, then defendant received ineffective assistance of counsel. The burden of proving ineffective assistance of counsel is on defendant. (*People v. Pope* (1979) 23 Cal.3d 412, 425, overruled on another ground in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10.) "To secure reversal of a conviction upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings. [Citations.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003; see generally *Strickland v. Washington* (1984) 466 U.S. 668, 687-694.)

Because we conclude there is no reasonable likelihood the jury misapplied the instruction as defendant contends, he has failed to establish counsel was ineffective for failing to object to the instruction or request clarification or, assuming deficient performance, that he suffered prejudice as a result. (See *People v. Coddington*, *supra*, 23 Cal.4th at p. 603, fn. 32.)[11] In this regard, " '[i]t is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions.' [Citation.] When a defendant claims an instruction was subject to erroneous interpretation by the jury, he must demonstrate a reasonable likelihood that the jury misconstrued or misapplied the instruction in the manner asserted. [Citation.] In determining the correctness of jury instructions, we consider the entire charge of the court, in light of the trial record. [Citation.]" (*People v. Covarrubias* (2016) 1 Cal.5th

---

[11] For the same reason, we would find no cause for reversal were we to address the merits of defendant's claim of instructional error. (See *People v. Lee*, *supra*, 51 Cal.4th at p. 638.)

838, 926; accord, e.g., *People v. Sattiewhite* (2014) 59 Cal.4th 446, 475; *People v. Solomon* (2010) 49 Cal.4th 792, 822.)

The evidence presented at trial was such that defendant fails to persuade us jurors might have seized on the "includes, but is not limited to," language of the instruction and come up with their own definition of "contractor" rather than adhering to the instructional definition that was responsive to the evidence. Jurors were told they could ask questions — even multiple questions, if need be — and how to go about doing so, but they expressed no confusion concerning the definition. Defendant's claim fails.

### III

#### SENTENCING ISSUES

As to count 1, probation was denied. Defendant was sentenced, pursuant to section 1170, subdivision (h)(5)(B), to the upper term of three years. The court found the upper term appropriate, and the term that best served the interest of justice in this case, based on defendant's repeated conduct in entering into contracts, and his significant criminal history in that he had been convicted several times of similar or identical offenses. The court declined to exercise its discretion to strike any of the prior prison term enhancements, and so enhanced the sentence by three years, for a total of six years. Although the prosecutor urged the court to order the entire sentence spent in custody, the court found a split term was appropriate. Accordingly, it ordered defendant to serve the first three years in custody, with the remainder of the sentence to be served on mandatory supervision on various terms and conditions. The court further ordered that defendant make restitution to the O.'s, pursuant to section 1202.4, subdivision (f), in an amount to be determined by the probation department. In addition, the court ordered defendant to pay a $300 restitution fine pursuant to section 1202.4, subdivision (b); a $40 court operations assessment pursuant to section 1465.8; and a $30 court facilities funding assessment pursuant to Government Code section 70373. The court also imposed but

suspended, subject to mandatory supervision revocation proceedings, a $300 fine pursuant to section 1202.45.

As to count 3, the court sentenced defendant to 180 days in jail, to run concurrently with the sentence imposed in count 1. The court ordered defendant to pay $40 pursuant to section 1465.8, and $30 pursuant to Government Code section 70373.

Last, the court ordered defendant to pay $40 per month in mandatory supervision costs, apparently pursuant to section 1203.1b.

Defendant was sentenced on April 9, 2018. Effective January 1, 2020, Senate Bill No. 136 (2019-2020 Reg. Sess.) amended section 667.5, subdivision (b) to provide for imposition of a prior prison term enhancement only where the prior offense was a sexually violent offense as defined in subdivision (b) of Welfare and Institutions Code section 6600. (§ 667.5, as amended by Stats. 2019, ch. 590, § 1.) Defendant's prior convictions do not meet this requirement, and defendant contends the enhancements based thereon must be stricken. The Attorney General agrees, as do we. We also agree with the Attorney General that the matter should be remanded for resentencing in order to permit the trial court to consider all sentencing options available. (See, e.g., *People v. Buycks* (2018) 5 Cal.5th 857, 893; *People v. Burbine* (2003) 106 Cal.App.4th 1250, 1258; *People v. Hill* (1986) 185 Cal.App.3d 831, 834.)

Because the prior prison term enhancements must be stricken, defendant's claim the trial court impermissibly imposed the upper term on count 1 by using the fact of the enhancements (§ 1170, subd. (b)), is moot. Also, because the matter is being remanded for a full resentencing, we need not address, at this time, defendant's claim the trial court erred by imposing monetary obligations without determining his present ability to pay. (See *People v. Dueñas* (2019) 30 Cal.App.5th 1157, 1164; but see *People v. Aviles*

(2019) 39 Cal.App.5th 1055, 1060-1061.)  If defendant wishes to pursue this argument, he may do so at the time of resentencing.[12]

## DISPOSITION

The judgment of conviction is affirmed.  The sentence is vacated and the matter is remanded to the trial court with directions to strike the section 667.5, former subdivision (b) enhancements and to resentence defendant.

DETJEN, J.

WE CONCUR:

HILL, P.J.

POOCHIGIAN, J.

---

[12]    We express no opinion, with respect either to the sentence to be imposed or the monetary obligations, how the trial court should rule upon remand.

18.