Filed 7/26/24  P. v. Cruz CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B330528 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA108298) |
| v. | |
| JOVANI CRUZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Rita L. Badhan, Judge.  Affirmed and remanded, with directions.

Lenore De Vita, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior

Assistant Attorney General, Zee Rodriguez and Charles S. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

――――――――――――――――

A jury found Jovani Cruz guilty of willful, deliberate, and premeditated attempted murder (Pen. Code,[1] §§ 664, 187, subd. (a)).  Cruz argues there was insufficient evidence to support a finding that he intended to kill.  He also asserts, and the People agree, that the abstract of judgment does not accurately reflect the sentence imposed.  We conclude there was sufficient evidence to support Cruz's attempted murder conviction.  We affirm the judgment and remand with directions to the trial court to correct the abstract of judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Ricardo A. was in a dating relationship with Teresa Gomez for approximately five years.  After Ricardo A. ended the relationship, his interactions with Gomez were "toxic."  Gomez followed Ricardo A., stopped by his apartment, and called him and his mother.  During one telephone call Gomez made to Ricardo A., she put an unidentified man on the phone who told Ricardo A. he was going to "get" him.

On the morning of July 30, 2020, Ricardo A. left his house and walked to his car to go to work.  Ricardo A. saw an individual, later identified as Cruz, running towards him and holding a gun.  Cruz was wearing all black clothing and a ski mask.  As Ricardo A. got into his car, Cruz pointed the gun at Ricardo A.'s face from directly in front of the car.  Ricardo A. started the car.  Cruz moved to the driver's side, still near the

―――――――――――――――――――

[1]     All undesignated statutory references are to the Penal Code.

2

front of the car, and fired the gun through the driver's side window.  He was approximately three feet away from Ricardo A.  Ricardo A. was holding the steering wheel with both hands when he was shot.  Cruz's shot hit Ricardo A. in his upper left arm, near his elbow.  Ricardo A. testified that he felt the shot just as he started to drive away.  A neighbor testified he heard "two thunderous sounds," followed by the screeching of a car driving away quickly.

Ricardo A. drove to a nearby store, asked for help, and was transported to a hospital.  At the hospital, a police officer observed a "gaping" wound on Ricardo A.'s upper left arm and several smaller wounds consistent with buckshot.  Ricardo A. testified that he had a large wound on his arm with smaller marks on his arm and torso.  Medical professionals removed some pellets from the wound.  Ricardo A. underwent surgery and remained in the hospital for about a week.  It took seven months for him to regain motion in his left arm.  His ability to lift his left arm was still impaired approximately two years later.

A detective interviewed Gomez on the night of the shooting.  Gomez confirmed she had a prior relationship with Ricardo A. and that he had ended it.  Gomez told the detective she was unhappy about the breakup, she had Ricardo A.'s name tattooed over her heart, she had jealousy issues regarding Ricardo A., and she had been trying to get back together with him.  Gomez also informed the detective that she was in a sexual relationship with Cruz.  While Cruz wanted to be in a romantic relationship with her, she was hesitant because she was still in love with Ricardo A.

Gomez admitted she had told Cruz she wanted to get back at Ricardo A. and cause him the same pain she felt due to their

breakup. Gomez had asked Cruz to "scare," "maybe fight," and "hurt" Ricardo A., but she did not want him to shoot Ricardo A. Gomez suggested that Cruz beat up Ricardo A. or verbally threaten him. She asked Cruz to scare Ricardo A. several times during the month and a half before the shooting. Gomez showed Cruz where Ricardo A. lived. She told Cruz when Ricardo A. left for work in the mornings and suggested that would be the best time to scare him. She also told Cruz the kind of car Ricardo A. drove and where he parked it, and she showed Cruz a photo of Ricardo A. Gomez admitted she thought Cruz would " 'seriously hurt' " Ricardo A. The day before Cruz shot Ricardo A., Gomez promised to marry Cruz, although she did not intend to do so. Cruz asked her if she would marry him if he were "locked up," and she said she would.

Gomez initially denied knowledge of the shooting and was surprised and distressed, but ultimately she admitted she knew about it. Gomez had been in Cruz's motel room the night before the shooting. She saw a gun and ammunition in the room. After the shooting, Cruz told Gomez he had shot Ricardo A. in the arm.

An investigating police officer located a 12-gauge shotgun loaded with birdshot ammunition hidden near the location of the shooting. The gun was jammed. The officer testified the jam would be exceptionally difficult to clear without proper training. The gun could not be fired again until the jam was cleared. According to the officer, birdshot is primarily used for hunting small game and birds. Some people believe it is "a very good personal defense shotgun round for home defense. Some people would say it's not as good for that . . . ." A different officer testified that birdshot is a shotgun round that contains small metal pellets inside a larger casing. The small pellets shoot out

4

from the gun in a wide pattern, which increases the chance of shooting a bird. The concentration of pellets is denser at close range and spreads wider as the pellets travel farther away from the gun.

Police arrested Cruz at the motel where he had stayed the night before the shooting. During a search of Cruz's motel room, police found unexpended 12-gauge shotgun cartridges. They also recovered a cell phone that contained text messages between Cruz and Gomez. In one audio text message from the day before the shooting, Cruz stated, "I just wanted to tell you that, um, I got something last night, so um . . . homeboy better count his blessings. Because you know what I'm talking about."

In February 2022, Cruz was charged by information with willful, deliberate, and premeditated attempted murder. (§§ 664, 187, subd. (a).)[2] The information alleged that Cruz personally inflicted great bodily injury on the victim (§ 12022.7, subd. (a)); personally used a firearm (§§ 12022.5, subd. (a), 12022.53, subd. (b)); personally and intentionally discharged a firearm (§ 12022.53, subd. (c)); and personally and intentionally discharged a firearm, which caused great bodily injury to the victim (§ 12022.53, subd. (d)).

In August 2022, a jury convicted Cruz of willful, premeditated, and deliberate attempted murder, and found true the firearm and great bodily injury allegations. In April 2023, the trial court sentenced Cruz to life in prison with the possibility of parole, plus 23 years. The determinate sentence consisted of 20 years for the section 12022.53, subdivision (c) intentional

---

[2]     The information contained only one count, which was labeled "Count 2." A February 15, 2022 minute order indicated the court granted the People's motion to dismiss count 1.

discharge of a firearm enhancement, and a consecutive three years for the section 12022.7, subdivision (a) personal infliction of great bodily injury enhancement.  The court imposed and stayed the section 12022.5, subdivision (a) and section 12022.53, subdivision (b) enhancements, and struck the section 12022.53, subdivision (d) enhancement.

Cruz timely appealed.

## DISCUSSION

Cruz contends there was insufficient evidence to support a finding that he harbored the intent to kill Ricardo A.  We affirm the judgment.

## I.     Standard of Review

"The test for evaluating a sufficiency of evidence claim is deferential: 'whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]  We must 'view the evidence in the light most favorable to the People' and 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.]  We must also 'accept logical inferences that the jury might have drawn from the circumstantial evidence.' [Citation.]" (*People v. Flores* (2020) 9 Cal.5th 371, 411.)  We affirm if the verdict is supported by substantial evidence, which is evidence that is " ' "reasonable, credible, and of solid value . . . ." ' " (*People v. Smith* (2005) 37 Cal.4th 733, 739 (*Smith*); see also *People v. Vargas* (2020) 9 Cal.5th 793, 820.) "The reviewing court does not perform the function of reweighing the evidence . . . ." (*People v. Culver* (1973) 10 Cal.3d 542, 548 (*Culver*).)  Reversal is not warranted unless it appears " ' " 'that upon no hypothesis whatever is there sufficient substantial

6

evidence to support' " the jury's verdict.' [Citation.]" (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.)

## II. Substantial Evidence Supports Cruz's Attempted Murder Conviction

To establish attempted murder, the People must prove the defendant committed a direct but ineffectual act with the specific intent to kill his victim. (*Smith*, *supra*, 37 Cal.4th at p. 739; *People v. Lee* (2003) 31 Cal.4th 613, 623.) "Intent to unlawfully kill and express malice are, in essence, 'one and the same.' [Citation.] . . . Express malice requires a showing that the assailant ' " 'either desire[s] the result [i.e., death] or know[s], to a substantial certainty, that the result will occur.' [Citation.]" ' [Citations.]" (*Smith*, at p. 739; *People v. Stone* (2009) 46 Cal.4th 131, 139.)

Cruz contends there is insufficient evidence he acted with the intent to kill because he shot Ricardo A. in the arm despite having a clear shot at a vital organ; he used birdshot rather than the large gauge ammunition found in his motel room; and he fired only one shot at Ricardo A. He also relies on evidence that Gomez only wanted him to scare Ricardo A., not kill him, and he was acting at her request.

We reject these contentions. Viewing the evidence in the light most favorable to the judgment, as we must, we conclude substantial evidence supports the jury's finding that Cruz harbored the specific intent to kill. Cruz shot Ricardo A. from approximately three feet away, with a 12-gauge shotgun, in the upper arm. "[T]he act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice." (*Smith*, *supra*, 37 Cal.4th at p. 742.)

7

In *Smith*, for example, the defendant shot into a vehicle from behind while his ex-girlfriend sat in the driver's seat and her baby sat in a car seat behind her. (*Smith*, *supra*, 37 Cal.4th at p. 742.) Though the bullet "missed both the baby and the mother by a matter of inches[,] . . . it shattered the rear windshield, passed through the mother's headrest, and lodged in the driver's side door." (*Id*. at p. 743.) Our high court held there was substantial evidence of an intent to kill because the "very act of discharging a firearm into the car from close range and narrowly missing both mother and baby could itself support such an inference." (*Id*. at p. 744.) Similarly, here, Cruz's act of shooting Ricardo A. in the upper arm supports an inference of intent to kill. While he did not hit a vital organ, Cruz shot Ricardo A. at a close range of three feet, in the upper body, where the pellets could easily have hit Ricardo A. in the chest or neck. (*Ibid*.; cf. *People v. Leon* (2010) 181 Cal.App.4th 452, 463–464 [substantial evidence of intent to kill "rather than to merely harass or scare the occupants of the vehicle" where, while traveling "close behind," the shooter fired a bullet into the taillight, which traveled into the car and killed a passenger].)

Cruz also argues that his use of birdshot rather than more lethal ammunition is evidence that he did not intend to kill Ricardo A. However, the jury heard evidence that birdshot is narrowly concentrated at close range and is used for personal and home defense. We may not reweigh this evidence on appeal. (*Culver*, *supra*, 10 Cal.3d at p. 548.) The jury logically could have concluded that Cruz's use of birdshot at a range of three feet, before it shot out in a wider pattern, was evidence of an intent to kill. "[T]hat the bullet misses its mark or fails to prove lethal" is not "dispositive—the very act of firing a weapon ' "in a manner

that could have inflicted a mortal wound had the bullet been on target" ' is sufficient to support an inference of intent to kill." (*Smith*, *supra*, 37 Cal.4th at p. 742.)

That Cruz only fired one shot also does not eliminate an inference of intent to kill. (Cf. *People v. Perez* (2010) 50 Cal.4th 222, 230 ["a rational trier of fact could find that defendant's act of firing a single bullet at a group of eight persons from a distance of 60 feet established that he acted with intent to kill *someone* in the group he fired upon"].) As described above, the shot was at close range and Cruz had only limited time before Ricardo A. drove away. Further, there was evidence that the gun jammed, and it would not have been possible to fire a second shot until the jam was cleared, which was difficult to do without proper training. " ' "The fact that the shooter may have fired only once and then abandoned his efforts out of necessity . . . does not compel the conclusion that he lacked the animus to kill in the first instance." ' " (*Smith*, *supra*, 37 Cal.4th at p. 741.)

Finally, although motive is not an element of attempted murder, it can be probative of a defendant's intent to kill. (*Smith*, *supra*, 37 Cal.4th at pp. 740–741.) Here, there was evidence of motive from which the jury could have reasonably inferred an intent to kill, even though Gomez claimed to have told Cruz to only scare Ricardo A. Cruz had romantic feelings for Gomez. Taking advantage of those feelings, Gomez asked Cruz to hurt Ricardo A. and conveyed that she wanted to cause Ricardo A. pain. Gomez said she told Cruz not to shoot Ricardo A., but she also admitted she believed Cruz would seriously hurt him. She promised to marry Cruz the day before the shooting. For his part, Cruz asked Gomez if she would marry him if he were "locked up," suggesting an intent to commit an act that would

9

lead to his incarceration, and his desire to win Gomez's affection and commitment.  This is circumstantial evidence that Cruz had a motive to fatally harm Ricardo A.  "Because direct evidence of a defendant's intent rarely exists, intent may be inferred from the circumstances of the crime and the defendant's acts."  (*People v. Sanchez* (2016) 63 Cal.4th 411, 457; *People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690.)

"Whether a defendant possessed the requisite intent to kill is, of course, a question for the trier of fact.  While reasonable minds may differ on the resolution of that issue, our sole function is to determine if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*People v. Lashley* (1991) 1 Cal.App.4th 938, 946; *People v. Cruz-Partida* (2022) 79 Cal.App.5th 197, 206.)  Based on the evidence at trial, a rational jury could have reasonably concluded Cruz acted with the intent to kill Ricardo A.  Substantial evidence supports the conviction for attempted murder.

## III.  Abstract of Judgment

"Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls."  (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385.)  "An abstract of judgment is not the judgment of conviction; it does not control if different from the trial court's oral judgment and may not add to or modify the judgment it purports to digest or summarize." (*People v. Mitchell* (2001) 26 Cal.4th 181, 185 (*Mitchell*).)  The trial court sentenced Cruz to 23 years plus life imprisonment *with* parole.  The abstract of judgment incorrectly states that Cruz was sentenced to life imprisonment *without* the possibility of parole.  The People concede that the abstract of judgment is

10

incorrect.  We agree that the abstract of judgment must be corrected to accurately reflect the sentence imposed as life *with* the possibility of parole.  (*Mitchell*, at pp. 185, 188 [courts may correct clerical errors at any time; appellate court may order trial court to make correction to abstract of judgment].)

## DISPOSITION

The judgment is affirmed.  The trial court is directed to correct the abstract of judgment to reflect that the sentence imposed on count 2 is life *with* the possibility of parole, plus 23 years, and to forward the corrected abstract of judgment to the California Department of Corrections and Rehabilitation.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ADAMS, J.

We concur:

EGERTON, Acting P. J.

BERSHON, J.*

_____

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.