Filed 12/13/24  In re Shawn M. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Shawn M., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SHAWN M.,<br><br>    Defendant and Appellant. | B330412<br><br>(Los Angeles County Super. Ct. No. PJ53949) |

APPEAL from an order of the Superior Court of Los Angeles County, Steven E. Ipson, Juvenile Court Referee. Affirmed.

David Zarmi for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant

Attorney General, Kenneth C. Byrne and Sophia A. Lecky, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

The juvenile court declared Shawn M. a ward of the court based on the finding that he committed vehicular manslaughter with ordinary negligence. (Pen. Code, § 192, subd. (c)(2).)[1] On appeal, Shawn contends there is insufficient evidence to support the juvenile court findings. We conclude substantial evidence supports the juvenile court's order and affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

On July 30, 2021, 16-year-old Shawn was driving a Camaro ZL1 that collided with a Honda C.R.V. driven by Ali Dhanani. Ali's wife, Noorbanoo Dhanani, was riding in the front passenger seat.[2] Noorbanoo died from the injuries she sustained during the accident.

A January 2023 first amended petition under Welfare and Institutions Code section 602 alleged that Shawn committed vehicular manslaughter with gross negligence (§ 192, subd. (c)(1); count 1) and vehicular manslaughter with ordinary negligence (§ 192, subd. (c)(2); count 2). Shawn denied the allegations.

A contested adjudication hearing took place in February and March 2023.

---

[1]    All further undesignated statutory references are to the Penal Code.

[2]    Because Ali and Noorbanoo have the same last name, we refer to them by their first names for clarity and intend no disrespect.

2

*Prosecution Evidence*

### A. *The accident*

At approximately 7:20 p.m. on July 30, 2021, the Dhananis' Honda C.R.V. approached the intersection of Mason and Corbin Avenues in Porter Ranch. It was dusk but still light out, and the sky was clear. The intersection is a "T intersection" with Corbin, an east-west road, ending at Mason, a north-south road, requiring a car traveling westbound on Corbin to turn right or left onto northbound or southbound Mason. A car traveling west on Corbin has limited visibility as it approaches the intersection; a driver cannot see if there is oncoming traffic on Mason north of the intersection. The speed limit on Corbin is 50 miles per hour and the speed limit on Mason is 40 miles per hour.

The Dhananis were traveling southbound on Mason. Ali moved into the left turn lane, from which drivers on southbound Mason turn left onto eastbound Corbin. At the same time, Shawn and his 16-year-old passenger were traveling westbound at 71 miles per hour on Corbin towards the intersection of Mason and Corbin. Shawn was attempting a right turn from westbound Corbin onto northbound Mason as Ali was driving southbound on Mason preparing to turn left onto eastbound Corbin.

Ali testified that he turned left on a green left arrow and was just past the white limit line and in the crosswalk when Shawn's Camaro hit him from the right passenger side.[3] The

---

[3] Ali explained that his previous statements right after the accident (with his son translating) that he was at a complete stop when the accident occurred, and subsequently (with his daughter translating) in a police interview at his home, were made when he was confused about the questions being asked and may not have understood.

3

Honda's airbags deployed. Noorbanoo screamed and was in pain. Ali asked a bystander to call 911. An ambulance subsequently arrived and took the Dhananis to a hospital.

Noorbanoo died at the hospital that evening. The doctor who conducted her autopsy testified that she died from multiple traumatic injuries consistent with her being in a car accident.

B. *Eyewitness testimony*

An eyewitness testified at trial for the prosecution. At the time of the accident, the eyewitness was in a car that was stopped at a red light at the intersection, heading northbound on Mason. He testified that there are two lanes heading northbound on Mason. On the other side of the intersection, he saw the Honda in the left turn lane behind the limit line. He and the Honda pulled up almost simultaneously and both had red lights. Nothing about the Honda caught his attention. The eyewitness did not see it cross the double yellow lines.

Then, from his right, he saw a Camaro heading towards the intersection on Corbin "flying in that right-hand turn lane . . . it caught my attention because it was going probably around 60 miles an hour. And it didn't seem like it was going to be able to negotiate that turn, so I was paying close attention to it." It appeared to the eyewitness that the Camaro driver was not in control of the vehicle due to his high rate of speed. The Camaro went into the intersection pretty much "straight, like, right at the Honda." It drove "straight into . . . the Honda." It was a "big crash" and the Camaro hit the Honda "hard."

The eyewitness described the right turn the Camaro was attempting to make as a 90-degree turn. The eyewitness was familiar with the intersection, and when shown a photograph, he testified that when driving westbound on Corbin towards Mason,

4

as the Camaro did, there is "a very limited amount of visibility" due to a structure and a hill.

After the collision, the eyewitness observed the Honda facing "not quite all the way backwards but turned around." It was pushed past the double yellow lines upon impact. The Camaro was pointing towards the sidewalk in the number two lane (the lane closest to the curb) of southbound Mason. The eyewitness went to help the driver of the Honda and called 911. At trial, he identified Shawn as the Camaro's driver.

### C.     *Law enforcement testimony*
#### a.     *Officer Ayala*

California Highway Patrol (CHP) Officer Ryan Ayala and another officer happened to be driving by the scene of the accident right after it occurred. They were the first law enforcement officers at the scene.

Ayala testified that when he arrived, both vehicles were facing east. He observed a vehicle in the number two lane of southbound Mason, closest to the curb, and one vehicle in the left turn lane close to the crosswalk. He also observed debris blocking the "number one lane of the southbound Mason traffic," which is the lane closest to the double yellow lines. He moved the debris because traffic was running over it, but he did not move the vehicles.

Ayala saw two juveniles standing near a Camaro. He asked one of the minors, Shawn, what happened. Shawn told Ayala that he was driving the Camaro and had come around the corner a little too fast and collided with a vehicle that was stopped at a stoplight. At the hearing, Ayala explained he was paraphrasing what Shawn had told him.

5

Los Angeles Police Department (LAPD) officers arrived and took over the collision investigation from CHP. Ayala testified that he identified the Camaro's driver for one of the LAPD officers and relayed the driver's statement that he had come around the corner too quickly.

### b. *Officer Tran*

LAPD Officer Cuong Tran is a traffic collision investigator who reports to the scene of traffic collisions, interviews parties, gathers evidence, and determines whether the drivers involved are impaired. He and LAPD Officer David Gulley responded to the accident after CHP arrived but before the cars were moved, at approximately 8:00 p.m.

Tran spoke with Shawn, who told him that the Honda had crossed over the double yellow lines. Shawn also told Tran that he did not have a passenger. Tran determined this was untrue because of an eyewitness's statement that two people got out of the Camaro, the Camaro's deployed front passenger airbag, the seatbelts being locked in the loose position, and seatbelt abrasions on another 16-year-old who was at the scene. Tran also determined that the cars collided in the middle to the left portion of the left turn lane on Mason. He concluded the Honda did not cross over the double yellow lines, because if it had, it would have sustained damage on the driver's side, and all the damage was on the front passenger side. Tran's determination was an estimate based on the eyewitness's statement, the damage to the vehicles, and the debris from the accident. He testified that if he knew the eyewitness was incorrect that the Honda was not moving, it would have affected his determination of the area of impact. No additional testimony was elicited on that point.

6

Tran also interviewed Ali at the hospital shortly after the accident. Tran testified that Ali's version of the accident was consistent with the damage and debris Tran observed at the scene. Ali told Tran that he was driving straight forward at the time of the collision on a green left turn arrow.

Noorbanoo died while Tran was interviewing Ali. Tran returned to the scene of the accident to make measurements, which, at the time, LAPD policy required only for fatal car accidents. Tran observed that there was a post-impact skid mark near where the Camaro stopped. Tran determined the skid mark came from the Camaro.

Tran concluded Shawn was at fault. He opined that Shawn had been driving at an unsafe speed, crossed over the double yellow lines, and failed to turn right into the lane closest to the right curb. All three of these actions were violations of the Vehicle Code. Tran did not have the data from the vehicles regarding their actual speeds, so he did not use that evidence to reach his conclusions. Tran testified that even if Shawn were driving the speed limit of 50 miles on Corbin, he would consider an attempt to take the turn at that high speed to be speeding.

### c.    *Detective Josh Wade*

LAPD Detective Josh Wade was assigned to investigate the accident. Wade spoke with Ali, the eyewitness, and Tran and Gulley. He also reviewed photos from the scene, visited the intersection and drove the turns, examined the damage to the vehicles, and obtained and reviewed the vehicles' electronic data.

The electronic data indicated that five seconds before impact, the Camaro was traveling at 71 miles an hour. The brakes were already applied, and the speed had been going down for five seconds. This suggested that earlier than five seconds

7

before the accident, the Camaro was traveling faster than 71 miles per hour. At one and a half seconds before impact, the brakes were off on the Camaro.

A half second before the collision, the Camaro was traveling at 37 miles per hour. Wade testified that even with the speed limit on Corbin at 50 miles per hour, it was a violation of the speed limit to drive 37 miles per hour when making the right turn onto Mason. Wade explained that if a driver's speed is too fast for the driver to be able to control the vehicle, it is a violation of the basic speed law. He opined that if a driver is not able to stay on the proper side of the roadway and that driver collides with another vehicle, the driver's speed was too great to make the turn safely.

Wade testified the Honda was traveling on Mason at 37 miles per hour five seconds before impact, it then sped up until three seconds before the accident to 43 miles per hour, while going downhill. At impact, the Honda was traveling at 27 miles per hour. The Honda's brakes were on starting three seconds before impact and remained on until the collision. The speed limit on Mason was 40 miles per hour. However, Wade found no evidence the Honda was traveling in an unsafe manner before the accident or that its speed in any way contributed to the collision. The steering data indicated that the Honda was making a slight right turn five seconds before impact.

Wade concluded that Shawn was at fault and the primary factor in his causing the accident was his speed. He also determined that Shawn crossed over the double yellow lines into the southbound lanes and failed to make a right turn into the lane closest to the curb. He explained that while at the time of impact, the data showed only a five-mile-per-hour difference in

8

the speeds the two cars were traveling, with the Camaro moving faster, the cars were attempting "completely different turns, [with] completely different turning radiuses," so the relatively similar speeds did not change his conclusion that the Camaro was at fault.

Wade acknowledged that the Honda's electronic data contradicted Ali's and the eyewitness's recollections, which were that the Honda was stopped at the light at the time of impact. Accordingly, he primarily relied on the photos from the scene and the data from the cars to reach his conclusion that Shawn was at fault. He did not rely on any statements from Ali or the eyewitness.

Wade also testified that the fluid patterns and the debris were all in the southbound lanes of traffic on Mason, with nothing in the northbound lanes. This was consistent with the impact occurring in the southbound lanes of traffic, and thus with Shawn being on the wrong side of the road. During cross-examination, Wade indicated no one had informed him that CHP had moved some of the debris. However, after being shown CHP dash camera video on redirect, he testified that he still only saw debris in the southbound lanes of Mason. The photos from the scene also showed the Camaro in the southbound lanes of Mason. The fluid pattern from the Honda also indicated that the collision occurred in the southbound lanes because there were no fluid patterns or leaked coolant "or anything in the northbound lanes."

### d. *Officer Whitmore*

Officer Daniel Whitmore, a member of the LAPD collision team, conducted a reconstruction of the accident. He reviewed Tran's report, looked at the photos and body-worn video from the scene, and "imaged" the data from the vehicles, which he

described as similar to downloading information from the vehicles.

Whitmore concluded that the Camaro's speed before the accident and its "loss of control," was "the issue" in the case, not the impact speeds. He testified that Shawn was driving "above freeway speeds on Corbin, which didn't allow him to make his turn. He lost control and collided with the [Honda] that was coming south on Mason." Whitmore explained that by approaching the intersection at more than 20 miles per hour over the speed limit, this "clearly demonstrated it was too great of a speed for the conditions and did not allow [Shawn] to safely make his turn."

Whitmore also testified the Camaro was traveling at 71 miles per hour five seconds before the collision on Corbin, at which time the brakes were already on, so the car had been traveling even faster. Whitmore opined that speeds in excess of 70 miles per hour on city streets are "inherently dangerous" because streets are not designed like freeways and they have intersections. He indicated the relevance of the speed five seconds before impact is that it "speaks to what led up to the crash . . . the loss of control," which does not happen "instantaneously." He explained: "There has to be a sequence of events that leads to—whether it's a conflict of a right-of-way or attempting to maneuver at a speed that's too great for the conditions or the roadway design. And in this case, a t-intersection, there's nowhere to go straight. And so approaching that intersection at 71 miles per hour is—it seems inevitable that it would lead to some type of an issue. [¶] . . . [T]hat loss of control didn't just happen in those final half second or one second. It was the decision process that began leading up to that

10

intersection." Whitmore also determined that Shawn had taken his foot off the brake for the last one and a half seconds before the impact.

Whitmore further testified that, generally, to execute a 90-degree turn, even on a "larger road like this," a car must slow to 10 or 20 miles an hour. He testified that "this vehicle may have been able to make a turn slightly faster than that, but [at] close to 40 miles an hour seems unlikely that it would be able to make that turn . . . ." He did not opine that taking the turn at 37 miles per hour was legally speeding because it was "somewhat subjective," "not a black-and-white thing," and would require tests as to characteristics of cars making the turn, but said it "does seem unreasonable and high." He then explained that it was "more important to focus on what led up to that moment of impact, and that was the excessive speed that led into that."

Regarding the Honda, Whitmore testified that the Honda's speed of 43 miles per hour three seconds before the collision, and 42 miles per hour two seconds before, was not concerning in the 40-mile-per-hour zone, particularly because the Honda was traveling downhill, the driver was applying the brakes, and the turn it was attempting was only 15 degrees. Whitmore also did not consider the Honda's 27 mile-per-hour speed at impact to be unsafe.

Whitmore testified that the Honda made a "hard steer right" immediately before impact. He opined that the last-minute steer reflected the driver seeing the Camaro coming into the Honda's path; it appeared the Honda's driver was reacting to an "emergency." Whitmore explained that the steering data was "normal" for a left turn until the final half second or second before the accident when Ali made the "aggressive[ ]" right turn.

On cross-examination, Whitmore agreed that the recorded data indicating the Honda was moving at the time of the accident contradicted the statements of Ali and the eyewitness, as conveyed in Tran's report. However, Whitmore stated that even if Tran had changed his report to state that the area of impact would change if the Honda was moving at the time of impact, this would not affect Whitmore's conclusion that the Camaro's speed caused the accident.

Whitmore further opined that the impact occurred in the southbound lanes of Mason, and the Honda did not cross the double yellow lines. However, he admitted could not determine exactly where the Honda was within the five seconds before impact. He did not find any evidence that the Honda crossed the double yellow lines, but could not say so "definitively" without a video of the incident. Regardless, he testified that in the absence of any evidence that the Honda was "completely over the double yellow line," the Camaro was traveling at a slower speed such that it could have made the right turn, and the cars collided head-on, the specific location of the Honda immediately before the collision did not affect his determination that the accident was caused by Shawn losing control of his vehicle. Whitmore opined that the Camaro had crossed over the double yellow lines into the southbound lanes on Mason, based on the area of impact and the at-rest position of the Camaro. This meant the Camaro did not turn right from the lane closest to the curb into the lane closest to the curb.

### Defense Evidence

#### A.  Officer David Gulley

LAPD Officer David Gulley responded to the accident with Tran. A CHP officer gave Gulley contact information for an

12

eyewitness, who informed him the Camaro was driving at approximately 50 miles per hour going into the turn. Gulley opined that this speed would constitute speeding because speed limits are designed for straightaways, not turns. He explained that a driver must turn at a speed slow enough to be in the proper lane throughout the entire turn. Gulley concluded that Shawn was driving too fast to make the right turn, and his speed was the primary factor causing the collision. Gulley also determined the Honda was on southbound Mason in the left turn lane at impact, just past the limit line. He further opined that a post-impact tire mark indicated the Camaro had ended up in the opposite lanes of traffic.

Gulley did not recall a CHP officer indicating that Shawn had admitted he had been speeding and lost control of his vehicle. Gulley agreed that he and Tran would have included all critical information in Tran's report.

## B. *Accident reconstruction expert*

Henricus Jansen, an accident reconstructionist, also testified for the defense. Based on computer simulations of the accident, he reached three conclusions.

First, Jansen concluded that, to a reasonable degree of engineering probability, at the time of impact the Honda was across the double yellow lines. This conclusion was based on Jansen's computer simulations and the fluid from the Honda. However, on cross-examination, he agreed that there was no "physical" or "direct" evidence that the Honda's center of gravity was over the double yellow lines at the time of impact.

Second, Jansen concluded the Camaro had abandoned its right "steer" and was turning left at the time of impact, based on his computer simulation's "impact analysis." He did not have

13

steering data for the Camaro, but his simulation indicated the Camaro steered left "out of its turn" between one and one half second before impact. He agreed the data showed the Camaro was traveling at 71 miles per hour, with the brakes on, five seconds before impact. However, he opined that because the Camaro was slowing down between five and two seconds before impact, it was a "controlled slow down." He also agreed that the data showed the Camaro's brakes were off one and a half seconds before impact, when its speed was 40 miles per hour. The brakes remained off until at least a half second before the collision.

Third, Jansen concluded the Camaro could have made the right turn at 40 miles per hour, from the left-most westbound lane on Corbin closest to the double yellow lines, without crossing into the wrong lane and oncoming traffic on Mason.[4] Jansen based this conclusion on his calculation that took into account the radius of the turn and the car's acceleration and velocity, the Camaro's performance package, and the car's general capabilities. But he had no opinion as to whether Shawn had the necessary ability as a driver to execute such a turn.

On cross-examination, Jansen testified that even assuming the Honda crossed the double yellow lines but only into the leftmost northbound lane of Mason (the lane that is closest to the double yellow lines, which is also known as the number one lane), if Shawn had "slow[ed] down" to 25 miles an hour, for

---

[4] Jansen's trial testimony referred to numerous computer simulations and slides of his calculations, which were not provided to this court as part of the record on appeal. It appears that Jansen's trial testimony was intended to indicate that, given the Camaro's capabilities and ability to make the turn without incident, the Honda must have crossed over the double yellow lines and into the Camaro's path.

14

example, to make the turn, he would have stayed in Mason's rightmost lane (the number two lane) and there would not have been an accident.

In sum, Jansen opined that the Camaro had abandoned its right turn and was steering left at the time of impact, and the Honda crossed over the double yellow lines into the path of the left-turning Camaro. Jansen further opined that even if the Camaro had still been steering right, given the car's capabilities, it could have executed the right turn into northbound Mason from the left, westbound lane on Corbin at a speed of even 40 miles per hour.

### Verdict and Appeal

The juvenile court found that because Shawn's car was traveling at 71 miles per hour five seconds before the incident, and at 53 miles per hour three seconds before the incident while approaching a blind intersection, he had violated Vehicle Code section 22350 by speeding.

The juvenile court also found that even if the Honda had crossed slightly over the double yellow lines, the impact was "largely in the left-turn pocket on Mason, and the Camaro was to the right side of the Honda based on the impact area being to the right side of the Honda and also to the right side of the Camaro. [¶] Thus, the Camaro couldn't make the turn. The Camaro did not maintain itself on the right side of the roadway. This is a violation of Vehicle Code section 21650 . . . ."

The juvenile court dismissed count 1 (gross vehicular manslaughter) and sustained count 2 (ordinary negligence). At disposition, the juvenile court declared the offense a misdemeanor, declared Shawn a ward of the court, and placed him on probation in the home of his parents.

Shawn timely appealed.

## DISCUSSION

### I. Standard of Review

" 'The same standard governs review of the sufficiency of evidence in adult criminal cases and juvenile cases: we review the whole record in the light most favorable to the judgment to decide whether substantial evidence supports the conviction, so that a reasonable fact finder could find guilt beyond a reasonable doubt. [Citations.]' [Citation.]" (*In re A.G.* (2020) 58 Cal.App.5th 647, 653.) Substantial evidence is "defined as reasonable and credible evidence of solid value." (*People v. Vargas* (2020) 9 Cal.5th 793, 820.) We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence, and we accept logical inferences drawn from circumstantial evidence. (*People v. Baker* (2021) 10 Cal.5th 1044, 1103.) We resolve conflicting inferences and credibility findings in favor of the verdict. (*People v. Collins* (2021) 65 Cal.App.5th 333, 344.) "The reviewing court does not perform the function of reweighing the evidence . . . ." (*People v. Culver* (1973) 10 Cal.3d 542, 548.) We do not reverse unless it appears " ' " 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " ' " the factfinder's verdict. (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.) " ' "The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence." ' " (*Vargas*, at p. 820.)

## II. Substantial Evidence Supports the Juvenile Court Finding That Shawn M. Committed Vehicular Manslaughter with Ordinary Negligence

Shawn argues the evidence was insufficient to support the juvenile court's finding that he committed vehicular manslaughter with ordinary negligence. He contends the evidence did not demonstrate beyond a reasonable doubt that he committed any Vehicle Code infractions, that his actions were dangerous to human life under the circumstances, or that he acted with ordinary negligence. We disagree.

### A. Applicable Law

Section 192, subdivision (c)(2), defines misdemeanor vehicular manslaughter as: "Driving a vehicle in the commission of an unlawful act, not amounting to a felony, but without gross negligence; or driving a vehicle in the commission of a lawful act which might produce death, in an unlawful manner, but without gross negligence."

To establish a violation of section 192, subdivision (c)(2), the People were required to prove: " '1. While driving a vehicle, the defendant committed a misdemeanor or infraction or a lawful act in an unlawful manner; [¶] 2. The misdemeanor, infraction or otherwise lawful act was dangerous to human life under the circumstances of its commission; [¶] 3. The defendant committed the misdemeanor, infraction or otherwise lawful act with ordinary negligence; [¶] AND [¶] 4. The misdemeanor, infraction or otherwise lawful act caused the death of another person.' " (*People v. Kumar* (2019) 39 Cal.App.5th 557, 565 (*Kumar*), citing CALCRIM No. 593.) Shawn asserts that the first three of these requirements were not supported by the evidence.

17

**B.    Discussion**

   **a.    There is substantial evidence of a Vehicle Code infraction**

The trial court found the evidence established that Shawn committed two infractions: violations of Vehicle Code sections 22350 (speeding) and 21650 (failing to maintain the car on the right side of the road).  We conclude substantial evidence supported the trial court finding that Shawn violated Vehicle Code section 22350; we therefore need not consider whether the evidence also supported the additional finding of a Vehicle Code section 21650 violation.

Vehicle Code section 22350 provides: "No person shall drive a vehicle upon a highway at a speed greater than is reasonable or prudent having due regard for weather, visibility, the traffic on, and the surface and width of, the highway, and in no event at a speed which endangers the safety of persons or property."  "The first portion of the statute prohibits driving over the speed appropriate for external conditions, and the second portion of the statute prohibits driving at any excessive speed.  Read together, both portions of the statute have effect and protect the public from any sort of dangerous speed." (*People v. Farleigh* (2017) 13 Cal.App.5th Supp. 12, 16 (*Farleigh*).)  Therefore, "a violation of [Vehicle Code] section 22350 does not require evidence that the posted speed limit was exceeded." (*People v. Garcia* (1993) 17 Cal.App.4th 1169, 1184 (*Garcia*).)  Rather, "it is a crime to drive faster than reasonably proper in the circumstances." (*People v. Lares* (1968) 261 Cal.App.2d 657, 665 (*Lares*).)

It is undisputed that five seconds before the collision, Shawn was driving 71 miles per hour, with the brakes on, which was 20 miles over the posted speed limit on Corbin.  "[S]peed in

18

excess of the posted or legal limits is prima facie unlawful unless clearly proved otherwise." (*Garcia*, *supra*, 17 Cal.App.4th at p. 1184.) Not only was Shawn driving significantly over the posted speed limit, he did so while approaching an intersection with limited visibility that required him to execute a 90-degree turn.

Officers Tran, Whitmore, Gulley, and Detective Wade all testified that Shawn's speed was too fast for the conditions and caused the accident. Officer Whitmore testified that speeds of 70 miles per hour on city streets are "inherently dangerous," pointing to the presence of intersections. He explained that the relevance of the speed five seconds before impact is that it "speaks to what led up to the crash . . . the loss of control." The intersection required Shawn to make a sharp turn, which he was unable to execute. Instead, he drove straight into the Honda. This indicates his speed of 70 miles per hour five seconds before the accident was not only over the posted speed limit and thus prima facie unlawful, but it was also too fast for the conditions. (*Garcia*, *supra*, 17 Cal.App.4th at p. 1184; cf. *Lares*, *supra*, 261 Cal.App.2d at p. 665 ["defendant was propelling the car at 45 to 50 miles an hour at the intersection of a paved and dirt road which met at right angles, and . . . as a result of the speed, the car was wrecked. This was a sufficient breach of the law . . . ."].)

Shawn counters that he was driving under the speed limit, at 37 miles per hour, half a second before impact. However, there is still a violation of Vehicle Code section 22350 if the speed is unreasonable given the conditions and it endangers persons or property. (*Garcia*, *supra*, 17 Cal.App.4th at p. 1184.) "The basic speed law does not automatically permit a driver to drive at the posted speed limit. If the conditions—including visibility or lack

19

thereof—are such that driving at the posted speed limit prevents drivers from seeing pedestrians in a crosswalk in time to avoid hitting them, they must slow down." (*Huerta v. City of Santa Ana* (2019) 39 Cal.App.5th 41, 51; see also *Farleigh*, *supra*, 13 Cal.App.5th at p. Supp. 14 [violation of basic speed law where the driver was heading towards the busy intersection under the speed limit with no hands on the wheel].)

There is substantial evidence that Shawn's speed of 37 miles per hour half a second before impact was still excessive. There was limited visibility on Corbin turning right onto Mason. Shawn was entering a T intersection, requiring a turn. Gulley testified that speed limits are designed for straightaways and a driver must turn slow enough to be in the proper lane throughout the entire turn. Whitmore testified that, generally, to execute a 90-degree turn a car must slow to 20 miles an hour.

There was additional evidence that Shawn could not safely make the turn at 37 miles per hour. Shawn himself told Ayala that he had come around the corner a little too fast and collided with the Honda. The eyewitness testified that the Camaro drove straight into the Honda after approaching the intersection at a high speed. Defense expert Jansen concluded that the Camaro abandoned the right turn before colliding with the Honda. By heading straight into the intersection, the inference in favor of the juvenile court's finding is that the Camaro was traveling too fast to safely make the turn.

Shawn also argues that the evidence was insufficient to support a violation of Vehicle Code section 22350 because his expert testified that Camaros are capable of executing turns at greater speeds than other cars and that Shawn's Camaro could have made the right turn at 40 miles per hour. Yet, that a

20

Camaro *could* have made the turn at this speed, as evidenced by the expert's calculation, does not render Shawn's speed reasonable or safe under the conditions.  The expert's opinion was undermined by the evidence that under the particular circumstances of this case, 37 miles per hour was too fast, as detailed above.  "It is not the role of this court to redetermine the credibility of experts or to reweigh the relative strength of their conclusions."  (*People v. Poe* (1999) 74 Cal.App.4th 826, 831.)

Finally, Shawn argues that because Whitmore, the People's accident reconstruction expert, "did not actually do anything to reconstruct the accident," and "the eyeballing of the accident scene by the other officers was rebutted by the defense expert's actual reconstruction," the People's evidence should be rejected as not of reasonable, credible, or solid value.  This argument misapprehends the standard of review.  Shawn does not argue on appeal that the trial court abused its discretion in admitting the People's evidence.  At the hearing, the People established the expertise of their witnesses and the information and processes underlying their conclusions and opinions.  On appeal, we do not reweigh the evidence or second guess the trial court's credibility determinations.  (*People v. Cruz-Partida* (2022) 79 Cal.App.5th 197, 206.)

Resolving all inferences in favor of the juvenile court's findings as we must, there is sufficient evidence that Shawn violated Vehicle Code section 22350 by driving above the speed limit five seconds before impact and traveling too fast for the conditions of the road, causing him to lose control and resulting in the accident.  Substantial evidence supports the juvenile court's finding that Shawn violated Vehicle Code section 22350.

### b. There is substantial evidence Shawn's infraction was dangerous to human life under the circumstances of its commission

There is also substantial evidence that Shawn's speed was dangerous to human life under the circumstances of its commission. "To support a conviction of violating section 192(c) the circumstances of the violation, not the offense in the abstract, must be dangerous to human life and safety." (*People v. Wells* (1996) 12 Cal.4th 979, 985, 984, fn. 5 [interpreting § 192, subd. (c)(1), but also observing that "[s]ection 192(c)(2) defines vehicular manslaughter in language identical to that of section 192(c)(1) with the exception that the act is without gross negligence"].) Shawn argues that for the same reasons there was insufficient evidence he violated the Vehicle Code, there was insufficient evidence that his actions were dangerous to human life. We disagree.

The circumstances of Shawn's speeding violation were dangerous to human life. It is undisputed that five seconds before impact, approaching a T intersection, he was driving 71 miles per hour, when the speed limit was 50 miles per hour. He was braking, which meant he had been driving faster than 71 miles per hour. His speed was excessive for a city street, particularly when approaching an intersection with limited visibility and 90-degree turns. (Cf. *People v. Bussel* (2002) 97 Cal.App.4th Supp. 1, 11 ["[f]ailing to stop for pedestrians in a crosswalk is manifestly dangerous to human life," even when driving at three or four miles per hour, where appellant did not stop at the intersection or see pedestrians when turning right].) There is substantial evidence that Shawn's speed caused him to

22

lose control and drive straight into the intersection, which was dangerous to human life. (*People v. Thompson* (2000) 79 Cal.App.4th 40, 55 ["conduct that makes death reasonably foreseeable and that 'might produce death' is by definition conduct dangerous to life or safety"].)

###    c.    There is substantial evidence that Shawn acted with ordinary negligence

Finally, there is substantial evidence that Shawn acted with ordinary negligence. "The mental state required for a violation of Penal Code section 192, subdivision (c)(2), is ordinary negligence." (*People v. Hamidi* (2023) 97 Cal.App.5th Supp. 1, 6.) " 'Ordinary negligence . . . is the failure to use reasonable care to prevent reasonably foreseeable harm to oneself or someone else. A person is negligent if he or she . . . does something that a reasonably careful person would not do in the same situation . . . .' (CALCRIM No. 593.)" (*Kumar*, *supra*, 39 Cal.App.5th at p. 564.) This standard is an objective one. (*People v. Superior Court* (*Sokolich*) (2016) 248 Cal.App.4th 434, 447.)

"It is the duty of a motorist to anticipate that he might meet pedestrians or vehicles at any point in the street and to keep his automobile under such control as will enable him to avoid a collision with persons using ordinary care and precaution." (*Burton v. Los Angeles Ry. Corp.* (1947) 79 Cal.App.2d 605, 609–610.) Shawn failed to do so. He was driving more than 20 miles over the speed limit five seconds before colliding with the Honda. He lost control and abandoned his turn. This was a failure to use reasonable care to prevent reasonably foreseeable harm to those cars and individuals in the intersection. A reasonable person would have complied with the speed limit, particularly when approaching an intersection that

required a turn.  (See *People v. Mendoza* (2007) 42 Cal.4th 686, 703 ["The 'reasonable person' is a hypothetical individual who is intended to represent a sort of 'average' citizen"].)  " 'A person is negligent if he or she does something that a reasonably careful person would not do in the same situation . . . .'  [Citation.]" (*People v. Nicolas* (2017) 8 Cal.App.5th 1165, 1175, citing CALCRIM No. 593.)

The People presented evidence that a reasonable person would also have navigated the 90-degree turn at 20 miles per hour and that 37 miles per hour was too fast.  According to the defense expert, if Shawn had been driving slower, even at 25 miles per hour, he would have been able to complete the turn and avoid the collision, even if the Honda was over the double yellow lines.  Thus, there is evidence that even though Shawn had slowed to 37 miles per hour and was therefore traveling below the speed limit a half second before the collision, his speed was too fast to avoid the Honda and was without ordinary care.  (Cf. *Gross v. Burnside* (1921) 186 Cal. 467, 469–470 [driving at legal speed limit was still negligent where a car was approaching an intersection with insufficient lighting, a slippery street, and the view was obstructed]; *People v. Ross* (1956) 139 Cal.App.2d 706, 710 [speed at intersection negligent where it was in "disregard" of the presence of other car and pedestrian and required the other vehicle to quickly accelerate to get out of the way].)

There is substantial evidence that Shawn was not driving the way a reasonably careful person would under similar circumstances.  Substantial evidence supports the trial court's finding that he acted with ordinary negligence.

**DISPOSITION**

The juvenile court order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ADAMS, J.

We concur:

EDMON, P. J.

EGERTON, J.